MARVIN W. GREENBERG, ADMINISTRATOR *AD PROSE-QUENDUM* OF THE ESTATE OF AMY F. GREENBERG, DECEASED, DEBRA GREENBERG AND MARVIN W. GREENBERG, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS, v. JAMES STANLEY, DEFENDANT-RESPONDENT, AND SAMUEL WALDOR, DEFENDANT-APPELLANT.

JAMES STANLEY, PLAINTIFF-APPELLANT, v. SAMUEL WALDOR, DEFENDANT-RESPONDENT.

Argued January 20, 1959—Reargued April 7, 1959—Decided July 30, 1959.

486

Mr. *John J. Monigan, Jr.,* argued the cause for appellant and respondent Samuel Waldor (*Messrs. Stryker, Tams & Horner,* attorneys; *Mr. Monigan,* of counsel).

Mr. *Abraham I. Harkavy* argued the cause for appellant and respondent James Stanley (*Messrs. Harkavy and Lieb,* attorneys; *Mr. Jerome S. Lieb,* of counsel and on the brief).

*Mr. Samuel A. Larner* argued the cause for respondents Marvin W. Greenberg, etc., *et als.* (*Messrs. Budd, Larner & Kent,* attorneys; *Mr. Larner,* of counsel).

The opinion of the court was delivered by

HALL, J.   This litigation arose from a tragic accident which occurred on the sidewalk running along the west side of Elizabeth Avenue, a short distance south of the corner of Stengel Avenue, in Newark on June 26, 1956.  Mrs. Debra Greenberg and a friend were wheeling their infant children in carriages on the sidewalk in a southerly direction.  James Stanley was driving his automobile in the same direction near the westerly curb.  He, along with other cars, had just resumed travel after stopping for a traffic light at Lehigh Avenue, one short block to the north.  Immediately before coming abreast of the mothers and their baby carriages, his car suddenly veered over the curb, struck Mrs. Greenberg and the carriage from the rear, killing the child and injuring the mother, and then collided heavily with a pole within the sidewalk area.  He suffered personal injuries and damage to his vehicle.

Weequahic Park extends along the east side of Elizabeth Avenue for a considerable distance in the general vicinity. An instant before the mishap Samuel Waldor drove his car out of a park exit almost opposite but slightly to the north of the intersection of Stengel Avenue with the west side of Elizabeth Avenue.  He turned left across the north lanes of Elizabeth Avenue, a wide thoroughfare at that point, and proceeded to go south thereon as Stanley reached Stengel Avenue.  The latter claimed that Waldor's entrance onto Elizabeth Avenue was made at a fast rate of speed, without obeying the stop sign at the park exit or observing the southbound traffic, and was so sweeping as to come close to the west curb, resulting in the forward progress of the Stanley car being blocked or "cut off," or threatened so to be, and thereby unavoidably forced to swerve onto the sidewalk without any fault on his part.  He also contended that Waldor's

vehicle actually touched his, but could not say that, if such were the case, it had any effect on his course. Waldor, on the other hand, asserted that he stopped and looked carefully before entering Elizabeth Avenue, and observing nothing to make a turn imprudent, proceeded slowly and straightened out with sufficient room for a car to pass on his right and that Stanley came up speedily, without proper observation or recognition of traffic leaving the park, drew almost abreast closely on his right and then suddenly mounted the curb. Waldor denied any contact between the cars and took the position that he was in no way the cause of or to blame for Stanley's swerving onto the sidewalk and the unfortunate consequences.

The Greenbergs charged both drivers with concurrent negligence in a suit seeking recovery for the child's wrongful death, Mrs. Greenberg's injuries and her husband's consequential damages. In their answers each driver denied his own negligence and in effect charged the negligent conduct of the other to be the sole cause of the Greenbergs' damages. By a separate action Stanley sued Waldor for his personal injuries and property damage. The latter's answer alleged contributory negligence by Stanley. No cross-claim for contingent relief under the Joint Tortfeasors Contribution Law (*N. J. S.* 2A:53A–1 *et seq.*) was filed by either driver (*R. R.* 4:13–6). The cases were consolidated for trial. *R. R.* 4:43–1(*e*).

At the trial neither claimed there was any contributory fault to bar the Greenbergs and it developed into a contest between the two drivers, each seeking to pin sole responsibility upon the other. The testimony by the drivers and the four witnesses who had observed all or part of the split-second events immediately preceding the tragedy was highly conflicting. Mrs. Greenberg had not seen either car before she was struck. The evidence is thoroughly analyzed in the opinion of the Appellate Division shortly to be referred to and all of it need not be repeated. The proofs were concededly such that it was open to the jury to find either

or both operators negligent. Exculpation of both could not be sustained.

The verdict in the Greenberg suit absolved Stanley by a finding of no cause of action in his favor and assessed damages against Waldor alone of $10,000 on the wrongful death claim, $27,500 in favor of Mrs. Greenberg and $1,000 for her husband. Stanley was awarded $10,000 in his action against Waldor. The latter's motion for a new trial upon all issues as to all parties in both suits, on which it was claimed the verdicts were against the weight of the evidence both as to liability and damages and should also be set aside for certain trial errors, was denied except that the death claim verdict was reduced to $5,000 and that in favor of Stanley to $7,500. In the Greenberg case Waldor appealed to the Appellate Division from "the whole of the final judgment * * * in favor of the plaintiffs and against the defendant Samuel Waldor," serving the notice of appeal on the Greenbergs and Stanley. The administrator *ad prosequendum* cross-appealed against Waldor from the reduction of the verdict on the claim for wrongful death. There was no appeal by the Greenbergs from the no cause verdict on their claims against Stanley. Waldor also appealed from Stanley's judgment against him. No review was sought by Stanley of the reduction of his damage award.

The Appellate Division, by its opinion reported at 51 *N. J. Super.* 90, affirmed the judgment of the Greenberg plaintiffs against Waldor alone, including the death claim as reduced, but reversed that in favor of Stanley against Waldor and awarded a new trial in that suit. We granted Waldor's petition for certification, notice of which was again given to the attorneys for Stanley as well as for the Greenberg's, "to review the final judgment of the Appellate Division entered in favor of the plaintiffs Marvin W. Greenberg, *et al.* in the above entitled actions * * *," and Stanley's similar application to review the appellate judgment in his action against Waldor, notice of which was likewise given to all other counsel. 28 *N. J.* 38. No further review was sought

by the administrator with respect to the reduction of the wrongful death award.

Waldor urged numerous alleged trial errors in the Appellate Division, all but one of which were found to be without merit. Most of the rejected contentions are resubmitted here. After careful consideration we are satisfied they were properly disposed of below in parts II, III and V of the opinion and no additional comment is required.

The remaining issue before us arises out of the result reached by the Appellate Division reversing Stanley's money judgment but denying relief to Waldor with respect to the Greenberg verdicts. The court found prejudice to Waldor sufficient to infect Stanley's award by reason of the persistent efforts of the latter's counsel to place inadmissible evidence before the jury and the denial of Waldor's consequent motion for a mistrial, but determined that it did not extend to the Greenberg verdicts against Waldor. No express mention was made in the opinion of the latter's contention that the no cause result in Stanley's favor in the Greenberg suit should also be set aside on the theory that substantial justice required a new trial as to all issues and all parties. The court rather parenthetically observed that no question had been raised as to the effect of its determination "upon any right of contribution of Waldor as against Stanley in respect to the Greenberg judgments" and so the matter had not been considered and no opinion was implied with respect thereto. 51 *N. J. Super.* at *pages* 104–105. Waldor's petition for a rehearing, based primarily on the questions just mentioned, was denied, as was a petition by Stanley seeking like relief.

Both men say that the conclusion of the Appellate Division is erroneous. Waldor urges that it does not go far enough because the situation requires a reversal and new trial of the entire Greenberg case as well, both on the theory of substantial justice and because otherwise the Greenberg verdicts may preclude a claim of contribution by him against Stanley if the ordered retrial of the latter's suit results in no cause for action. Stanley contends, and here his appeal

enters the picture, that the proffered evidence was admissible and there was no prejudice or reversible trial error warranting a reversal even of his damage award against Waldor. He further says that the incident in the trial court cannot on any theory upset his exoneration by the jury from the Greenberg claims, and in this connection urges, for the first time, that Waldor, being a co-defendant, has no standing to attack that exoneration in any way. The Greenbergs, with an admitted right to recover from one of the two, if not both, and satisfied with their awards against Waldor alone, naturally seek to uphold the result in the Appellate Division. So they join in Stanley's contentions with respect to their suit and express no particular interest in the final outcome of the action between the two drivers as long as their secured position is not affected.

The problems thus posed may well be considered from three aspects. First, was the evidence sought to be introduced by Stanley admissible and, if not, did such substantial prejudice to Waldor result from the incident as to infect any of the verdicts? Second, if the latter be so, should or must such infection be limited to the Stanley-Waldor suit? Third, if it cannot be so confined, what should the effect be on the Greenbergs?

These questions must be considered primarily in the light of the situation in the case as it was when the evidence was offered, subject, of course, to anything that might have happened in the trial subsequently which could be said to have cured any error that occurred. The Greenbergs had a well-nigh perfect case of liability against some one and apparently were not greatly concerned, from the standpoint of collectability of damages awarded, with obtaining verdicts against both drivers. Their counsel adopted the common trial tactic in such situations of calling not only certain of the eye-witnesses, but both driver-defendants, as plaintiffs' witnesses, questioning each as to his version of the accident. The contest being essentially between the drivers, each sought through his own testimony to exculpate himself from blame

and cast it on his co-defendant. This is accentuated by the fact that each defendant can be cross-examined by his own counsel as well as by the attorney for his co-defendant. *N. J. S.* 2A:81–11; *Teel v. Byrne,* 24 *N. J. L.* 631 (*Sup. Ct.* 1854). The result in such situations is that the full testimony on liability, at least from the standpoint of the personal stories of the defendants, generally comes in on a plaintiff's main case and it therefore behooves counsel for each defendant to bring out his position as strongly as possible not only by cross-examination of his own client but by similar examination of the co-defendant who may well not be called to the stand again on his own case. Each defense counsel makes objections to questions asked of a defendant, whether it be his own client or the co-defendant, by counsel for the other defendant as well as by a plaintiff's attorney, and generally injects himself into the plaintiff's case against the co-defendant and the latter's defense, even though no cross-claims between the defendants may have been filed. This is what happened here and led to the incident involved.

At the time Stanley had not been entirely successful in establishing his "cut-off" theory. It was, of course, most desirable for his counsel to present evidence to support it not only by his client's own testimony but, to be more persuasive to the jury, by the corroborative evidence of other witnesses and inferences and admissions, if possible, from Waldor's own testimony. Mrs. Zucker, Mrs. Greenberg's walking companion, had been the first witness called by plaintiffs. She testified that the Waldor car came nearer the curb than the center of the street, leaving just enough room for another car between it and the curb. She had had only a momentary glimpse of the Stanley car before it catapulted into Mrs. Greenberg, the child and the pole. She said both cars were going very fast and from the noise she heard it had seemed to her "as if the two cars had scraped."

The next witness was Harry Handelman, who had been sitting in his car parked on the east side of Elizabeth Avenue just south of the park exit, about opposite the acci-

dent scene. His eyewitness testimony, taken as a whole, was not completely consistent and not particularly helpful to Stanley's version. He had seen the latter start up, after stopping for the light at Lehigh Avenue, "a little faster than he should have started" and proceed southerly to Stengel Avenue close to the curb "going faster than he should have." He had observed Waldor come out of the park "fast" and make his turn without slowing down, which he described as not a wide one. He said Stanley, going "fairly fast," was midway through the Stengel Avenue intersection when Waldor came out of the park. The latter's turn was completed and there was room enough for one car to pass on his right when Stanley gradually turned to the right without change of speed and went up on the sidewalk. Other than this, he did not know where Waldor's car was when Stanley deviated from his course and heard no noise of contact between the vehicles. The principal thing favorable to Stanley was of a contradictory nature brought out on cross-examination by his counsel when the witness admitted the correctness of a statement made three days after the accident in which he had said: "As this bright car [Stanley] approached Stengel Avenue a light green car [Waldor] just shot out of the park exit onto Elizabeth Avenue, turned left going south and it appeared like it might have cut off the bright car going south * * *. This car tried to avoid an accident and it swerved to the right, seemed to lose control and it went on the southwest corner sidewalk of Elizabeth Avenue and hit a baby carriage * * *."

Stanley himself was the next witness called by the Greenbergs. His testimony of what happened was, as detailed in the Appellate Division opinion, somewhat equivocal. He said he had reached or was in the Stengel Avenue intersection when he first saw Waldor coming out of the park exit "very fast" and making a left turn, but later testified on cross-examination by his own attorney that it appeared as though Waldor would cut across in front of him rather than proceed south on Elizabeth Avenue. He further said he then

took his foot off the gas and put it on the brake pedal and pulled to the right as far as he could. While testifying at one time that Waldor came very close to the left side of his car, he was positive on two other occasions during his examination that Waldor's right front fender hit his left rear fender although he could not say the impact changed his course. (His attorney knew that proofs he subsequently offered were intended to show by paint found on the left rear side of Stanley's car and alleged corresponding scrape marks on the right rear side of Waldor's vehicle that any contact took place at those points and not as Stanley testified.) In any event, his turn or swerve to the right brought him in contact with the curb causing his chin to hit the steering wheel, rendering him unconscious and so unable to testify as to what happened after that. It was also brought out during cross-examination on behalf of Waldor that Stanley's car was new and equipped with power steering, a device that had not been installed on previous cars he had owned.

The Greenbergs then called Waldor as their witness. He testified that he had stopped and looked at the park exit, saw Stanley's car and another halted for the traffic light at Lehigh Avenue, started out slowly on his left turn and had straightened out, going about 20 miles an hour, with adequate room for another automobile between him and the curb, when suddenly he was attracted by the screeching of brakes, looked to his right rear and saw Stanley coming up very fast and close along that side. The front end of the latter's car came about even with Waldor's driver's seat. He said he kept going and then Stanley jumped the curb and hit the pole with a terrific impact. He was positive the cars had not touched. He pulled to the curb, stopped and seeing a serious situation, drove at once two blocks to a store and called the police. He then walked back to the scene, where people had gathered. All of this testimony had been developed in direct examination by the attorney for the Greenbergs and uncompleted cross-examination on

behalf of Stanley, Waldor not yet having been cross-examined by his own counsel.

■ Then came the series of questions on cross-examination by Stanley which culminated in the motion for mistrial. It was evident at this point that Stanley's "cut-off" theory was by no means completely supported. His own testimony was at least in part susceptible of a contrary inference, and that of Waldor and Handelman was not clear-cut. The state of the proof then was that, while Waldor might well be found to be negligent, a jury could also very properly conclude that Stanley was guilty of concurrent fault. Stanley had taken Waldor's deposition in pretrial discovery proceedings, where the interrogation is not limited to evidence admissible at trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence (*R. R.* 4:16–2), in the course of which the latter had testified that when he returned to the scene he "heard some remarks from people that there was a green car; a green car cut him off; something about that" and had made no response. This was what Stanley's counsel sought to introduce through cross-examination. The incident, up to the mistrial motion, is set forth verbatim in the Appellate Division's opinion. 51 *N. J. Super.* at *pages* 100–101.

■ The first question is whether this evidence was admissible. We agree completely with the Appellate Division that the trial court correctly ruled it was not. That it was contained in the deposition of a party does not automatically make it admissible. It is elementary that any part of a deposition may be used at a trial only "so far as admissible under the rules of evidence." *R. R.* 4:16–4. Stanley's counsel contended before the trial judge that it was proper proof under the principle, as the Appellate Division put it, "that the nondenial of an inculpating statement made in the presence of the party charged may amount to an admission of its truth where the statement was heard by the party and would naturally have been denied by him if he had a motive for denying it and did not intend to admit it." (51

*N. J. Super.* at *page* 101.) The principle has long been recognized in New Jersey in both civil and criminal actions. *State v. Kobylarz,* 44 *N. J. Super.* 250 (*App. Div.* 1957), certification denied 24 *N. J.* 548 (1957); *Ollert v. Ziebell,* 96 *N. J. L.* 210 (*E. & A.* 1921); *Donnelly v. State,* 26 *N. J. L.* 463 (*Sup. Ct.* 1857), affirmed 26 *N. J. L.* 601 (*E. & A.* 1857). The soundness of the rule has been questioned and, as pointed out in *Kobylarz* and by the leading text writers, to avoid prejudice and injustice must be used with caution and only when the trial judge is satisfied preliminarily that all conditions for its application have been established by the proponent, or at least that a reasonable jury could so find. 4 *Wigmore, Evidence* (*3d ed.* 1940), § 1071; *McCormick, Evidence* (1954), § 247. And it must always be remembered that the statement "is not offered as evidence of the truth of its assertions, but merely as giving meaning to the defendant's silence or evasive response." *McCormick, ibid., p.* 529. Not only must it have been made in the presence of the party to the action to whose silence is sought to be attributed an assent to the adoption of it as his own, and so giving rise to an inference of consciousness of guilt or fault, but he must be shown to have heard and understood it and, most important to the instant question, that it was made "under such circumstances, and by such persons, as naturally to call for a reply, if he did not intend to admit it. * * * [I]f the statement was made by a stranger, whom he is not called upon to notice * * * then no inference of assent can be drawn from that silence." This requisite was so stated in the early leading case of *Commonwealth v. Kenney* (12 *Metc.* 235), 53 *Mass.* 235, 237 (1847).

Obviously, the circumstances here did not meet this preliminary requirement. The statement or statements were not shown to be anything more than rumors voiced by unidentified people standing around the scene of a tragedy. They were not made to Waldor for, at that moment, no one there knew he was the driver of the green car. He was

not called upon to notice them and no reply on his part was "naturally" called for. It would be most unjust to permit any inference unfavorable to him to be drawn therefrom. Nor are we at all impressed with the suggestion now made by Stanley's counsel that the evidence was admissible as affecting Waldor's credibility. A gratuitous observation made by an unknown some one, not shown to have any knowledge to support his statement and not called to testify concerning it, cannot be used for any such purpose, even if it could fairly be said that the party whose credibility was thereby sought to be attacked had testified inconsistently or contradictorily to it, which was not the case here. We are unable to find basis for admissibility on any theory.

Next must be considered whether the offer of the inadmissible evidence occurred in such a fashion as to result in prejudice to Waldor. Here we assume that Stanley's counsel in good faith, though mistakenly, believed the statement to be evidential. At the same time it must also be realized, and it is made plain by the previously adverted to indecisive state of the proofs to support Stanley's theory at that stage of the case (which in fact continued to the end of the trial), that it was of very considerable importance to his counsel to put this statement about a "cut-off" before the jury. Such a powerful observation, made minutes after the occurrence by some person or persons, whom a lay jury, knowing full well what "cut-off" connotated, might well assume witnessed the accident and spoke spontaneously, could well swing the balance in Stanley's favor. His experienced counsel undoubtedly fully appreciated this and he was probably as much, if not more, interested in having the jury hear the observation as the fact that Waldor made no reply. While the jury never heard about the latter, the bystanders' statement about the "cut-off" was given to the jury twice by incorporation in his questions, even though objections thereto were sustained. The unreliability of the statement is patent and demonstrates the resulting unfairness when permitted to get into the case. Stanley was still

unconscious in his car. Handelman had taken the baby to the hospital. Mrs. Wuhl, driver of the car which had been proceeding in the same direction as Stanley, had left for the same place with Mrs. Greenberg. Her passenger, Mrs. Saperstein, had not left the car. Mrs. Zucker had not seen enough before the crash to know how the accident really came about. It was not shown that there were any other eyewitnesses.

Analysis of the series of questions propounded on behalf of Stanley makes clear the vice of the incident. Unfortunately, in the beginning counsel for Waldor, who must have known what was coming since he had participated in the deposition, was not explicit in his objections, nor was Stanley's counsel helpful to the court in making known the purpose of the line of interrogation, so that the court's reasons for the rulings were initially not clear to the latter. Such, however, does not sanction overzealous persistence after objections to questions have been continually sustained. In fact, Stanley's present brief admits "the better course might have been to save the objection to the trial court's ruling for appeal. * * *" Waldor first testified that, on his return to the scene, he heard people talking about a green car. Objections were sustained to the next three questions asking whether he told any of these people that he was the owner of the green car and what they were saying about it, for the reason that a foundation had not been laid. Then came several questions which elicited the information that the comment was being generally made, in Waldor's hearing, by pedestrian bystanders and not by any one in authority, thereby establishing the inapplicability of the "admission by silence" rule. The next query: "What did you hear that someone say?" was objected to and the objection sustained without comment. That should have ended the matter and if counsel had abided by the court's ruling as was his duty, there would have been no harm done. But he immediately then read from the deposition containing the remarks about the "cut-off" as previously quoted, asking if the witness had

not so testified.  Vigorous objection was made and for the
first time counsel stated to the court his theory of admissi-
bility.   The objection was sustained, the court remarking
that no foundation had been laid, meaning no doubt founda-
tion for competency.   Counsel persisted, however, along the
same line; there was another question excluded on objection
and then, inexcusably, the query was again put:   "Didn't
you hear somebody at the scene of this accident say that a
green car had cut off the Stanley car?"   (It should be pointed
out that the vice was not so much the characterization of
"cut-off" as a conclusion, but rather that the term imputed
grave fault in the operation of the car.)   Waldor's motion
for a mistrial followed.   It was argued and denied outside
the presence of the jury, and with no comment or instruc-
tions given to the jury, after being recalled to the court
room or at any later time, to disregard the bystanders'
comments made known through incorporation in the improper
questions.

We are satisfied, as was the Appellate Division, that sub-.
stantial, uneradicated prejudice to Waldor resulted from the
incident, but we are equally convinced, contrary to the view
of that court, that it infected not only Stanley's recovery
in his suit against Waldor but also the verdict against
Waldor in the Greenberg case.   We say the error was un-
eradicated because there is no merit in Stanley's argument
that any harm was cured by subsequent reference to the
comments on Waldor's further examination by his own
counsel at a later stage in the trial.   The questioning at
that time was in an entirely different context and the
spectators' comments were not repeated, although Stanley's
counsel tried to bring them in again but was prevented
following objection.

Moreover, as has been intimated, what happened on
Waldor's cross-examination is the type of prejudicial occur-
rence which must be recognized as most likely not to be
susceptible of cure or practical eradication from the minds
of lay jurors.   The nature of the bystanders' comments under

the particular circumstances would be most apt to leave an indelible impression. In view of the ample evidence in the case from which negligent conduct by Stanley, as well as by Waldor, could be found, apart from the effect of any "cut-off" by Waldor as the immediate cause of the mishap, we cannot escape the conviction that the improper introduction of the spectators' remarks might well have also tipped the scales to bring about Stanley's exoneration and the placing of sole liability on Waldor's shoulders. *Cf. State v. Costa,* 11 *N. J.* 239, 249–252 (1953).

We are unable to agree with the reasoning and conclusion of the Appellate Division that, while the improper cross-examination was so prejudicial to Waldor on the issue of Stanley's contributory negligence in his suit against Waldor as to require a new trial of that action, there was no appreciable degree of probability that it affected the Greenberg verdict against Waldor. This conclusion was rested on the fact that there was sufficient other evidence of Waldor's negligence to sustain that result against him alone. But, in the very nature of the situation present, if Stanley were contributorily negligent with respect to his claim against Waldor, he would be guilty of primary negligence in the Greenberg suit against both. So we fail to see any basis for the distinction that the prejudice would affect the jury and was harmful in the one case but was harmless in the other. It cannot be said that the jury could not have given any weight to the bystanders' comments on the question of primary negligence to the Greenbergs. In a case such as this where the improper cross-examination seriously and strikingly tended to inculpate one defendant and exculpate the other, the error cannot be found harmless on any aspect and, in the interests of substantial justice (*R. R.* 1:5–3(*b*), neither verdict against Waldor should be sustained. *Ferry v. Settle,* 6 *N. J.* 254 (1951).

However, both Stanley and the Greenbergs argue that the denial of a motion for mistrial rests in the discretion of the trial court and should not be disturbed by an appellate

tribunal. This contention assumes that the Appellate Division inferentially held, without directly saying so, that Waldor's motion for a mistrial should have been granted when made. We agree that such is the real holding, although an anomalous one since that court found there had been prejudice only with respect to Stanley's suit. A mistrial of the consolidated actions would, of course, have terminated the trial and required a new trial as to both suits. We think the motion should have been granted with that result.

It has, of course, often been said that the denial of a mistrial will not be found erroneous on appeal unless there is a clear showing of mistaken use of discretion by the trial court. *Carter v. Public Service Coordinated Transport,* 47 *N. J. Super.* 379, 389 (*App. Div.* 1957); *Budden v. Goldstein,* 43 *N. J. Super.* 340, 344 (*App. Div.* 1957); *Schuttler v. Reinhardt,* 17 *N. J. Super.* 480, 484–486 (*App. Div.* 1952). What is really meant is that such matters depend very largely on the "feel" of the case which the trial judge has at the time and his first-hand judgment in denying such a motion will not be reversed by a reviewing tribunal on a cold record, even if the appellate court might have acted otherwise if sitting at the trial, unless it so clearly appears from the printed page alone that the happening on which the motion was based was so striking that because of it one of the parties could not thereafter have a fair trial. *Wright v. Bernstein,* 23 *N. J.* 284, 296 (1957); *Schuttler v. Reinhardt, supra* (17 *N. J. Super.* at *pages* 484–486); *Patterson v. Surpless,* 107 *N. J. L.* 305 (*E. & A.* 1930). Even in most situations of such an exceptional occurrence, as pointed out in the cited cases, the harmful effect can be sufficiently eradicated by immediate and strong admonitory instructions to the jury, which it is the obligation of the judge to give on his own initiative, so as to make a mistrial unnecessary. See also *Paxton v. Misiuk,* 54 *N. J. Super.* 15 (*App. Div.* 1959); *Purpura v. Public Service Electric & Gas Co.,* 53 *N. J. Super.* 475 (*App. Div.* 1959); *Haid*

*v. Loderstedt*, 45 *N. J. Super.* 547 (*App. Div.* 1957). There are cases, however, when the prejudicial effect of the misconduct is so damaging that no instruction of the court can counteract its effect. *Cf. State v. D'Ippolito*, 19 *N. J.* 540, 548 (1955). We are not called upon to say whether this is such a case since no cautionary charge was given by the trial judge at any time. It is clear to us beyond any doubt, therefore, that the failure to grant Waldor's motion for a mistrial under all the circumstances was erroneous, and substantial justice now requires the Greenberg judgment against him, as well as Stanley's damage award in his suit, to be set aside but on conditions to be mentioned.

What should be the effect of this conclusion on Stanley's no cause verdict in the Greenberg suit? Waldor urges, as he did both in the Appellate Division and on motion for new trial in the Law Division, that substantial justice requires a new trial as to all parties on all issues, while Stanley takes the position that Waldor has no standing to attack the exoneration in any way. We think Waldor's position is well taken, with reservations, under the special circumstances here present. In view of the fact that he has not attempted to appeal from Stanley's judgment against the Greenbergs entered on that verdict, we are not called upon to consider his further contention that a co-defendant has such a right in this State since the adoption and by reason of the incidents of the Joint Tortfeasors Contribution Law (*N. J. S.* 2A:53A–1 *et seq.*) even where he has filed no cross-claim. *Cf. Donofrio v. Farr Lincoln Mercury, Inc.*, 54 *N. J. Super.* 500 (*App. Div.* 1959).

Waldor's initial argument rests on the well settled discretionary power of an appellate court in this State to order a reversal as to all or less than all defendants where harmful error has been committed against less than all, dependent on fundamental justice under the peculiar facts and circumstances of the case. *Ferry v. Settle*, 6 *N. J.* 262 (1951). Speaking broadly, there has been no hesitation to

utilize the power in the interests of fairness in many varied types of situations where the reversible error found affected less than all of the parties involved or all of the affected parties had not appealed or some like circumstance existed, but in which it would be unjust to some party to allow judgments to stand in favor of or against the non-affected or non-appealing parties. *E. g., Ferry v. Settle, supra* (6 *N. J.* 262); *Potter v. Hill,* 43 *N. J. Super.* 361 (*App. Div.* 1957); *Tedeschi v. Silver Rod-Paterson, Inc.,* 15 *N. J. Super.* 322 (*App. Div.* 1951); *Marzotto v. Gay Garment Co.,* 11 *N. J. Super.* 368 (*App. Div.* 1951), affirmed 7 *N. J.* 116 (1951); *Roberts v. Saunders,* 118 *N. J. L.* 548 (*E. & A.* 1937). Conversely, where the error is distinctly applicable to one party only and reversal as to that party only is not unfair or prejudicial to any other party and the cause of action is separable, the reversal will only extend to the infected judgment or part thereof. *E. g., Maccia v. Tynes,* 39 *N. J. Super.* 1 (*App. Div.* 1956); *Dahle v. Goodheer,* 38 *N. J. Super.* 210 (*App. Div.* 1955); *Gindin v. Baron,* 11 *N. J. Super.* 215 (*App. Div.* 1951). There may be much to be said for the rule apparently prevailing in Pennsylvania that, where an injured plaintiff charges co-defendants with concurrent negligence, a reversal as to one necessitates a new trial as to both (even if the second had been exonerated by the jury), on the basis that "[i]n weighing the question of responsibility for the accident a jury cannot fairly dispose of the case without having both parties before it so as to enable it to determine which of the operators was negligent, or whether both were at fault; * * *." *Nebel v. Burrelli,* 352 *Pa.* 70, 41 *A.* 2d 873, 875 (*Sup. Ct.* 1945); *Kile v. Jones,* 389 *Pa.* 339, 132 *A.* 2d 683 (*Sup. Ct.* 1957). But we need not go that far in this case, for all the equities here, under our discretionary practice, point to the need for also setting aside Stanley's no cause verdict in the Greenberg suit.

As in *Ferry v. Settle,* the question of liability "arose out of an intermingled group of facts and circumstances pre-

sented to the jury as a composite picture." (6 *N. J.* at *page* 265.) The prejudice which we have found to have infected the verdicts against Waldor was brought about by the action of Stanley's counsel and it must reasonably follow that, if it could have tipped the scales against Waldor, it just as probably tipped them in favor of the exculpation of Stanley. Moreover, it could be very unfair to the Greenbergs to require them to retry their case against Waldor alone with Stanley having been exonerated. With one participant in the accident not before the jury, it would probably be urged that he alone was at fault and not the defendant on trial, with the possible unconscionable result of a no cause verdict in Waldor's favor and no recovery by the Greenbergs against any one. Moreover, this is a consolidated action and consolidation is designed to secure a consistent result in all of the joined suits as well as to save trial time and expense. Since Waldor's notice of appeal in the Greenberg suit was served on Stanley, he was fully put on notice of the former's contention in this respect and, in fact, fully argued the point both here and in the Appellate Division.

There remains the question of injustice to the Greenbergs if the new trial encompasses all issues. They are not only the innocent victims of the tragedy absolutely entitled to recover their damages from one or both of the defendants and satisfied with their judgment against Waldor alone, but they are also similar victims of the prejudicial cross-examination with which they had nothing to do. The amounts of their damages have been fully and fairly tried and reviewed at the trial and appellate levels with the propriety thereof finally settled. They should not be required to prove them again for redetermination by another jury. No prejudice can result to either defendant if that issue is not relitigated. Moreover, since both defendants concede that a jury verdict of no cause for action against both of them could not be sustained, the Greenbergs should not be put to the risk of another jury inexplicably reaching that result, thereby re-

quiring still another trial. We consequently believe that fairness dictates the new trial of the Greenberg suit should be limited to the question of liability as between Stanley and Waldor or as to both, with damages to remain as heretofore finally determined, judgment to be entered in those amounts against such defendant or defendants as the jury may find liable. The jury is to be instructed that it may not return a verdict in favor of both defendants, and the Greenberg proofs on the liability issue may be presented accordingly. Stanley's suit against Waldor shall be completely retried on all issues, with the jury being specifically instructed that if it finds the former liable to the Greenbergs, there must be a no cause verdict against him in his own action.

This court has ample power to so direct. *R. R.* 4:61–1(*a*), referring to new trials in the trial court provides that "a new trial may be granted to all or any of the parties and as to all or part of the issues * * *." The rule has been relied upon in determining that similar power exists in our appellate courts. *Kress v. City of Newark,* 8 *N. J.* 562, 576 (1952); *Capone v. Norton,* 8 *N. J.* 54, 64 (1951); *Paolercio v. Wright,* 2 *N. J.* 412, 417 (1949). It was broadly said in *Kress:* "When, as here, a new trial is necessary, it may in the sound discretion of the court, be limited to the question with respect to which the verdict is found to be wrong." (8 *N. J.* at *page* 576.) This court has exercised the power in numerous appropriate situations to direct a new trial as to damages only. *Paolercio* is an example. While it does not appear to have been utilized to order a new trial confined to a limited issue of liability, an early case indicates that such power exists for use in an appropriate case. *More-Jonas Glass Co. v. West Jersey & Seashore Railroad Co.,* 76 *N. J. L.* 9, 10 (*Sup. Ct.* 1908). It has been generally held elsewhere that such authority is inherent and is not dependent on statute or rule. 39 *Am. Jur., New Trial,* § 21; *Annotation, "Grant of new trial on issue of liability alone, without retrial of issue of damages,"* 34 *A. L. R.* 2d 988, 990 (1954). Instances of comparable situations where a course was adopted

similar to that directed here may be found in *Ratcliff v. Myers,* 382 *Pa.* 196, 113 *A. 2d* 558 *(Sup. Ct.* 1955) ; *Koops v. Gregg,* 130 *Conn.* 185, 32 *A. 2d* 653 *(Sup. Ct. Err.* 1943), and *Haley v. Calef,* 28 *R. I.* 332, 67 *A.* 323 *(Sup. Ct.* 1907).

The judgment of the Appellate Division affirming the judgment of the Greenberg plaintiffs against Waldor is reversed, the judgment in the trial court in favor of Stanley in the same suit is set aside, the judgment of the Appellate Division reversing Stanley's judgment against Waldor is affirmed and the consolidated action is remanded to the Law Division for a new trial to the extent and under the conditions herein ordered. Costs are allowed in this court and in the Appellate Division to the Greenbergs as against Stanley only. Costs of the Greenbergs at the trial level, with respect to both the original trial and the new trial here ordered, shall be awarded against the party or parties found liable to them on the new trial. All costs as between Waldor and Stanley shall abide the event of the new trial.

WEINTRAUB, C. J. (dissenting). The factual thesis against Waldor was that he, turning left into Elizabeth Avenue, crossed the path of Stanley's car. In the parlance of the road, it was claimed that Waldor "cut off" Stanley. There was ample evidence to support that theme.

Waldor admitted a left turn and said the cars came within some two feet of each other. Paint found on the Waldor car was identified with the Stanley vehicle, thus indicating actual contact. Waldor said he stopped immediately, drove one block to a store to telephone the police, parking the car around the corner, and then returned to the scene on foot. He talked with policemen who had arrived by car. He then went to the Beth Israel Hospital, his intended destination. Some 15 or 20 minutes after the accident the police informed him at the hospital that a baby had been killed in the accident. According to Waldor, he insisted his car be inspected at once and it was.

Plaintiffs on their case called both defendants. Counsel for Stanley, cross-examining Waldor, sought to elicit the fact that upon returning to the scene after making the telephone call, Waldor heard some one say a green car (Waldor's car was green) had cut off the Stanley car. On pretrial examination Waldor had volunteered that he heard the remark.

Waldor denied any involvement and yet admitted that on his own he spoke to the police and later asked them to inspect his car. In these circumstances it was appropriate to explore his motivation. Indeed, one would expect Waldor himself to offer an explanation to avoid an inference that he was conscious of culpability. Later in the case, when called as a witness in his own behalf, Waldor did undertake to explain in terms of some statement he heard at the scene that suggested he might have been at fault. It may well be that the cross-examination in question was proper to explore a possible consciousness of responsibility. It, however, was not pressed on that basis, and for present purposes I will assume it could not have been.

The cross-examination was conducted on the thesis that Waldor failed to deny a statement importing that he had cut off Stanley and hence an admission to that effect should be inferred. I agree he was under no duty to speak in response to a statement made by some unknown person and not addressed accusingly at him. Moreover, Waldor did deny involvement to the police, a fact which adequately dispelled acquiescence by silence. Nonetheless, I find no basis for disturbing the judgments entered in the trial court.

The testimony sought to be elicited did not come in. Nor did the suggestion of a cut-off introduce something foreign to the case; it was already in the record through other witnesses. It seems most unlikely that the jury would have given additional weight to the rumor, even if it disregarded the trial court's ruling, since the rumor would readily be attributable to one of the witnesses who appeared at the trial. Moreover, Waldor later testified substantially

to the same rumor. Immediately after the motion for mistrial was denied, Waldor testified without objection that he told the police that "I understand that somebody claims it is a hit and run driver, green car," and that "I can't understand that they referred to me or is it some other car, but I thought I would call it to your attention." Later, testifying in his own behalf, he said on direct that "due to the fact that I heard different rumors at the scene of the accident I insisted of them to look at my car at that moment." Asked on cross-examination to state the "rumors," he answered, "I heard someone say hit and run driver." The latter answer was received over objection, and I think permissibly so on the issue of credibility, even though Waldor might have been entitled to an instruction that the content of the rumor was not evidential against him. In any event, the answer merely repeated what Waldor had already said. Thus, the fact that some unidentified person at the scene inculpated another driver, who could only be Waldor, otherwise come into the case. The sole difference between the testimony admitted and the testimony excluded was the reference in the latter to the subject of a cut-off. The difference is not significant, because under the facts upon which both Waldor and Stanley agreed, Waldor's involvement could only be in terms of impeding the movement of the Stanley car, and hence, whether it be called "hit and run" or "cut off," the implication would be essentially the same. I cannot find any harm in the fruitless effort of counsel to elicit what later did come into the case.

It should be stressed that the issue is not whether improper testimony was admitted with prejudicial effect; the objection was sustained. Rather, the question is whether the trial court misused its discretion in denying a motion for a mistrial based upon an effort to adduce testimony. The trial consumed some five or six days. The trial judge had the feel of the case. He was best situated to determine the impact of the incident. An appellate court should not lightly quarrel with an exercise of discretion in such circumstances.

The Appellate Division commented that there was "no justification for trial counsel deliberately blurting out the damaging question after the court had sustained objection to the line of examination five times and counsel had been heard in defense of the proposed interrogation and his contention overruled." If counsel deliberately pursues an improper course, it may become difficult for him to deny he achieved the unfair advantage he sought. But the thought is here inappropriate.

The difficulty arose from a failure of communication. Counsel for Waldor objected without specifying his grounds. Counsel for Stanley said he thought "it is material," to which the trial court replied, "I don't think a foundation has been laid." Later counsel for Stanley stated his thesis that a person "by his silence" may be deemed to subscribe to an unfavorable statement, to which the trial court again said, "You haven't laid a foundation to support that at all." Counsel thought the court meant he had not proved that Waldor heard the statement, although in fact Waldor had already testified that he had. Counsel was pressing to show that Waldor heard the remark when the motion for a mistrial was made. In the argument which followed, counsel for Stanley explained what he understood the court meant by lack of foundation. The record then reads:

"The Court: I am frank to say that I haven't understood that this witness heard the statement.

Mr. Harkavy: It is in the record. I asked him if he was close enough to hear it. He said yes.

The Court: I said the foundation wasn't laid. When I said the foundation wasn't laid for competency, I have in mind my recollection of the testimony that somebody simply in the crowd made a statement.

Mr. Harkavy: One of the first questions I asked was whether he heard it said and he said yes. I think there is another time when he said he was close enough and he said one person said it.

The Court: My impression was that you were addressing a question to him which was founded on something that someone else said. * * *"

After a recess, the court denied the motion but reaffirmed its ruling:

"Mr. Harkavy: Before the jury comes in, sir, in only the utmost desire to facilitate the situation, may I ask your Honor's reason?

The Court: It is not competent.

Mr. Harkavy: May I ask if your Honor feels that I haven't laid a foundation?

The Court: You haven't laid a sufficient foundation to make it competent.

Mr. Harkavy: Is that in line with what you said earlier that you didn't recall any evidence?

The Court: Yes, in addition I notice that the person who made the statement, the purported statement, has not been identified who would know the fact with the result that this defendant would be called upon to respond to the statement."

I find no basis for suggesting that counsel acted other than in good faith, seeking to meet what he thought was the basis for the ruling.

I am convinced that this incident, of a minor, run-of-the-mill character, has been isolated and magnified by the special attention accorded it on appeal.

I would affirm the judgments as entered in the trial court. Hence I would affirm the judgment of the Appellate Division in the case of the Greenbergs against Waldor and would reverse it in the case of Stanley against Waldor.

JACOBS, J., joins in this dissenting opinion.

*For reversal in part and affirmance in part*—Justices BURLING, FRANCIS, PROCTOR and HALL—4.

*For affirmance in part and reversal in part*—Chief Justice WEINTRAUB and Justice JACOBS—2.