**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2245-19

CANDACE SCOTT and
DONALD SCOTT, her
husband,

     Plaintiffs-Respondents,

v.

MICHAEL I. GOLDBERGER, M.D.,
MARIANNE CABEZAS, PA-C, and
TRI-COUNTY ORTHOPEDICS,

     Defendants-Appellants.

_____

Argued October 12, 2021 – Decided November 24, 2021

Before Judges Sumners and Vernoia.

On appeal the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-2185-16.

Walter F. Kawalec, III, argued the cause for appellants (Marshall Dennehey Warner Coleman & Goggin, attorneys; Walter F. Kawalec, III, and Robert T. Evers, on the briefs).

Bruce H. Nagel argued the cause for respondents (Nagel Rice, LLP, attorneys; Bruce H. Nagel and Susan

Fetten Connors, of counsel and on the brief; Emma McElliott, on the brief).

PER CURIAM

In this medical malpractice lawsuit, a jury found defendants Michael I. Goldberger, M.D., and Tri-County Orthopedics liable for deviating from the applicable standard of care with respect to treatment provided to plaintiff Candace Scott following surgical repair of her torn peroneal tendon. The jury awarded Candace[1] and her husband, plaintiff Donald Scott, a total of $550,000 in damages.

Defendants contend the trial judge abused his discretion by: (1) denying their motions for mistrial that were made during and after the trial on the basis they were not informed that Candace's trial testimony would differ from her deposition testimony regarding the name of the person she spoke to at defendants' office seeking post-surgery advice, and (2) refusing to let defendants present an avoidable-consequences argument by cross-examining plaintiffs' expert to prove Candace was responsible for her emergency surgery caused by blood clots following repair of her torn peroneal tendon. We disagree and affirm substantially for the reasons articulated by the judge in his rulings.

---

[1] For convenience, we refer to plaintiffs by their first names because they have the same last name. We mean no disrespect.

A-2245-19

I

On October 13, 2014, after initially examining and treating Candace on May 29, 2014, for lingering left-ankle pain and swelling, Dr. Goldberger, an employee of Tri-County Orthopedics, successfully performed a surgical repair of her torn peroneal tendon. Four days later, on October 17, Candace had a follow-up visit with Dr. Goldberger, who instructed her to begin a daily regimen of 325 milligrams of aspirin to thin her blood to prevent clotting, and if blood clots formed, to prevent them from propagating. In addition, the doctor directed his physician's assistant, defendant Marianne Cabezas, PA-C,[2] to replace a splint on Candace's left foot with a cast. Cabezas placed a cast just below Candace's kneecap that covered her lower leg and foot, ending short of her toes.[3] According to Candace, she told Cabezas the cast was "very tight." Cabezas replied that it is supposed to be tight.

In Candace's next visit on October 24, she complained to Dr. Goldberger about bruising of her left leg caused by the cast. Cabezas removed and replaced the cast, with the new one being about two inches lower from her kneecap. The doctor did not return to examine Candace, nor did he order any diagnostic tests.

---

[2] Shortly before trial, claims against Cabezas was dismissed with prejudice.

[3] A cast that is split down both sides.

A-2245-19

Candace had office visits on October 29 and November 7, voicing her complaints to Dr. Goldberger regarding continuing leg pain and lack of feelings in her toes. At the later visit, Cabezas removed the cast and a male staff person replaced it. Dr. Goldberger was not present when the cast was replaced and did not return to examine Candace before she left.

On November 9, while at a delicatessen after attending church, Candace fell off her scooter,[4] landing on the right side of her body. When her right leg began to bruise, she called Dr. Goldberger's office on November 13 and 14[5] to find out if she should stop taking aspirin. When Dr. Goldberger failed to return her call her within the next few days, she stopped taking aspirin because her bruises worsened.

On November 18, Dr. Goldberger examined Candace and, due to her left calf swelling, ordered a Doppler study. The study revealed she had extensive

---

[4] The scooter allowed her to place her surgically repaired left leg on a seat while using her right leg to maneuver.

[5] Candace did not specifically testify that this was the date but because she fell on Sunday, November 9, 2014, and did not begin calling Tri-County Orthopedics until that next Thursday, the date of the first phone call would be November 13. These dates are consistent with plaintiffs' orthopedic surgery expert, Dr. Harvey Sicherman, who referred to these phone calls as the ones that occurred on November 13 and 14.

blood clotting in the left-ankle region and proceeding up her leg and through her pelvic region. Consequently, she had two emergency surgeries to restore blood flow.

This medical malpractice action ensued in which plaintiffs asserted defendants deviated from the applicable standard of care, causing them damages. Discovery proceeded and the case went to trial, resulting in the jury finding that Dr. Goldberger and Tri-County Orthopedics were liable to Candace. Damages were awarded in the amount of $500,000 to Candace for pain and suffering, disability, impairment, and loss of enjoyment of life; and $50,000 was awarded to Donald on a per quod claim for loss of his wife's services, companionship, and society.[6] During and after the trial, the judge denied defendants' motions for mistrial, which form the basis of this appeal.

---

[6] At trial, plaintiffs also presented a theory that Dr. Goldberger had negligently supervised Cabezas. The jury disagreed and found in favor of defendants.

A-2245-19

II

Before us, defendants argue the judge abused his discretion in denying their motion for a mistrial. They sought a mistrial, claiming they were prejudiced by a "trial by ambush" when Candace testified that she spoke to Tri-County Orthopedics's scheduling secretary, Tiffany Rodriguez, during the November 13 and 14 telephone calls which differed from her deposition testimony that she spoke to x-ray technician, Mercedes Peralta. Defendants argue that plaintiffs' counsel violated her ethical duty under McKenney v. Jersey City Med. Ctr, 167 N.J. 359 (2001), to inform them before trial of Candace's material change in testimony. They assert this lack of notice of a substantial change in testimony constituted a manifest injustice requiring a mistrial.

To provide context, we discuss the controverted testimony. At her deposition, Candace, who had been Dr. Goldberger's patient for about five years prior to her peroneal tendon surgery, testified she had "always worked with" Mercedes[7] when she called to schedule her appointments with Dr. Goldberger during 2014. According to Candace, Tri-County Orthopedics has "like a tree[-]chain [answering service] or something. [She] had the number for Dr.

---

[7] We refer to Mercedes by her first name, as well as Tiffany, because this is how they are mentioned throughout the record. We mean no disrespect.

Goldberger's team. Whenever [she] called, it would always be Mercedes." She indicated that Mercedes was always diligent and responsive.

During her deposition, Candace also said that after her fall at the delicatessen, she tried calling Mercedes the following Thursday, November 13. There was no answer. She left a voicemail message explaining her fall and bruising down her right leg that attributed to taking aspirin. Her call was not returned. She called again the next afternoon, November 14. Again, she left a voicemail message. This time she said, "if I don't hear from anybody[,] I'll assume that there is no problem with my stopping the aspirin." No one called her, so she stopped taking aspirin on that Saturday. She testified that on Sunday morning she "noticed that [her] left leg from the calf down was larger than [her] right. It was scary, it was really scary." On Monday morning, Cabezas called her and an appointment was scheduled for Tuesday, November 18. Candace stated this was the first time she spoke to Cabezas on the phone. At the appointment, Dr. Goldberg saw her and ordered the Doppler study.

At trial, during her direct examination, Candace said that following her fall at the delicatessen, she tried to call Tiffany, not Mercedes, seeking direction

on whether she should continue to take aspirin.[8] She recalled speaking to Tiffany, who was at the front desk at her October 17 appointment. Defense counsel's objection to the change in testimony was overruled. Candace followed by explaining her mental mistake in confusing the two women. On cross-examination, defense counsel, over plaintiffs' counsel's objection, was allowed to attack Candace's credibility about the Tiffany/Mercedes discrepancy. In fact, despite still having Tiffany's business card from her October 17 appointment, Candace admitted she tried to speak to Mercedes and did not mention Tiffanyuntil the trial.

At the conclusion of Candace's testimony, defendants moved for mistrial, claiming, as they do now, plaintiffs' counsel's failure to notify them that Candace would change her deposition testimony by stating she tried to speak to Mercedes warranted a mistrial under McKenney. Plaintiff's counsel acknowledged she knew before trial that Candace was going to change the name of the person she spoke to in her testimony. Defendants' motion was denied without prejudice,

---

[8] Dr. Goldberger testified during trial that no such telephone calls were made because, had they been, either a live operator or the office's answering service would have responded to Candace.

allowing them to renew it at the trial's conclusion. Following the trial, their renewed mistrial motion was also denied.[9]

Upon weighing the parties' arguments, Judge W. Hunt Dumont determined Candace's change in testimony was not material to any issue in the case to warrant a mistrial. The judge reasoned:

> [W]hen all is said and done, I regard this as a mistake in the names and the testimony involving the change in the names, while it had some impact on [Candace's] credibility, it didn't have enough of an impact for the jury to disbelieve [her]. And her testimony at her deposition was really consistent with her trial testimony except for the name change.
>
> And while . . . the name change did result in a surprise to [d]efense [c]ounsel, and you could argue, as he did, as a good attorney, that it was a McKenn[e]y situation, nonetheless, when all is said and done, I believe that it was completely neutralized because it was a phone call that was made with respect to the cessation of aspirin therapy, and the aspirin therapy was stopped when [Candace] did not receive a return call the day before she got the return call. And no harm was done because aspirin became an issue strictly because it implied some type of fault by [Candace], and I wanted to make sure that the jury did not weigh her fault against the fault of [Dr. Goldberger], because that's not allowed.

---

[9] We note that defendants' post-trial motion was for a mistrial rather than a Rule 4:49-1 motion for a new trial. The standard for granting the respective motions is the same. Pressler & Verniero, Current N.J. Court Rules, cmt. 1.5 on R. 4:49-1 (2022).

> Comparative negligence is not allowed in this situation. You don't compare [Candace's] conduct against [Dr. Goldberger's] conduct. [Dr. Goldberger's] conduct, was he negligent, was he not negligent, is to be viewed in its own right without any reference to what [Candace] did.

Also, in finding no prejudice, the judge distinguished this case from McKenney:

> Here, [unlike in McKenney,] the change arose during [Candace's] own testimony. There was time to defend it, there was time to bring in Tiffany, whether Tiffany was on the witness list or not does not matter. The [c]ourt would have allowed it because of the surprise to [defense counsel]. Tiffany was not brought in, and while yes, the rules at this point do everything they can to eliminate unfair surprises during trial, trials are not perfect. No one gets a perfect trial, they get a fair trial. And under the circumstances, this was a fair trial, and the motion for a mistrial is denied.

Having reviewed the record, we affirm substantially for the reasons stated by Judge Dumont in his thoughtful oral opinion. We add the following comments.

It is within a trial court's discretion to deny the extraordinary remedy of a mistrial. Mistrials should only be granted "with the greatest caution, under urgent circumstances, and for very plain and obvious causes." State v. Loyal, 164 N.J. 418, 436 (2000) (citation omitted). The question turns on whether

10

continuance of the trial and submission of the case to the jury would result in manifest injustice. Wright v. Bernstein, 23 N.J. 284, 296 (1957). A trial judge should therefore exercise her or his discretion to grant a mistrial "with great reluctance, and only in cases of clear injustice. . . . Neither trial nor appellate courts may grant a new trial unless it clearly appears there was a miscarriage of justice." Boryszewski v. Burke, 380 N.J. Super. 361, 391 (App. Div. 2005). In considering the denial of a mistrial, our review depends "very largely on the 'feel' of the case which the trial judge has at the time." Greenberg v. Stanley, 30 N.J. 485, 503 (1959). Hence, we defer to a judge's decision not to declare a mistrial absent an abuse of discretion. Ibid.

There was no abuse of discretion by Judge Dumont in denying defendants' motion for mistrial. Defendants' reliance on McKenney is misplaced. Candace's changed testimony was unlike the material and prejudicial change in McKenney. There, the plaintiffs sued the Jersey City Medical Center (JCMC) and several of its staff members involved in the birth of their child who was afflicted with spina bifida. McKenney, 167 N.J. at 364. The plaintiffs asserted the defendants failed to inform them about their child's condition, claiming that such information should have been seen on sonograms prior to the time an abortion could have been lawfully performed. Ibid. In deposition testimony, one of the defendants,

Dr. Long-Gue Hu, Chief Obstetric/Gynecological resident at JCMC, acknowledged viewing the scans well in advance of the child's birth. Id. at 366. However, at trial, Dr. Hu changed his testimony, stating that upon review of a JCMC sonogram logbook that plaintiffs' counsel had unsuccessfully sought during discovery, he determined that he probably did not review the sonogram until weeks later after an abortion was no longer an option. Id. at 366-67. Another witness, a certified ultrasound sonographer, who was an original defendant but was dismissed on summary judgment, also changed her testimony during trial from what she initially provided in her deposition. Id. at 367. It was later revealed that defense counsel learned of the testimony changes the night before trial and failed to notify plaintiffs' counsel. Id. at 369.

The McKenney Court held a mistrial was warranted because the two changes in testimony required the plaintiffs to develop entirely new theories on liability and damages because changes made by: (1) the ultrasound sonographer suggested that she may, in fact, have had a role to play in causing the parents' injury, but she had been dismissed from the case because her earlier testimony had suggested the opposite; and (2) Dr. Hu intimated that he did not review the sonogram until after it was impossible for the plaintiffs to seek a legal abortion, but their action was based on their belief that a legal abortion would have been

12

possible because he had reviewed the sonogram at an earlier date. Id. at 373-75.

The Court concluded:

> For [the] plaintiffs to proceed to trial without being informed of the surprise testimony created a "'make believe' scenario [for the plaintiffs], the legal equivalent of half a deck." [The] [p]laintiffs went to trial misled by false information. Hence, the failure to grant a mistrial was an abuse of discretion.
>
> [Id. at 375-76 (2001) (citations omitted).]

In this case, Judge Dumont did not abuse his discretion in denying the motion for a mistrial, as the changed testimony was hardly akin to that which justified a new trial in McKenney. The judge correctly found Candace's changed testimony about whom she spoke to at defendants' office—Tiffany or Mercedes—did not affect a material or significant issue before the jury. Candace's change in testimony regarding whom she called before deciding to cease her aspirin regimen was not a material issue because, as will be discussed in detail below, the judge correctly determined that the "[a]spirin's out of the case," and therefore her comparative negligence was not an issue to be decided by the jury.

Moreover, assuming Candace's change in testimony was material, there was no prejudice to defendant to warrant a mistrial as was the situation in

McKenney. Candace's change in testimony speaks only to her credibility. Defendants argue had they known she was going to change her testimony from speaking with Mercedes to Tiffany, they would have had more time to prepare a stronger case as to why the jury should not have believed her account of the phone-call timeline and, in turn, rejected Dr. Sicherman's conclusion that Dr. Goldberg had deviated from the standard of care. Defendants, however, were given an opportunity to make these credibility attacks. The judge, over plaintiff's counsel's objection, allowed defense counsel to spend ample time cross-examining Candace about to whom she spoke and stressing the inconsistencies between her deposition and trial testimony, getting her to admit she had Tiffany's business card all along.

III

Defendants additionally contend the judge should have permitted them "to present [avoidable consequences] evidence, under Ostrowski [v. Azzara, 111 N.J. 429 (1988)], that a portion of the harm [Candace] allegedly suffered was caused by her lack of ordinary care in stopping her aspirin regimen without being instructed to do so by Dr. Goldberger." Defendants contend they should have been able to present such evidence through plaintiffs' orthopedic surgery expert Dr. Sicherman.

14

Dr. Sicherman testified on direct examination that Dr. Goldberger twice deviated from the standard of care. He first opined the doctor failed to return Candace's November 13 and 14 telephone calls, seeking guidance on whether she should continue to stay on her aspirin regiment. He then contended that Dr. Goldberger's failure to order the Doppler study in a timely manner allowed deep-vein thrombosis and extensive, propagated blood clotting to develop throughout Candace's lower body. He asserted that when Candace told Dr. Goldberger about her pain, swelling, and cast tightness in her late-October and early-November visits, a Doppler study should have been performed.

Defendants sought to discredit Dr. Sicherman's testimony on cross-examination by showing that Candace's decision to stop taking aspirin contributed to her blood-clot propagation, as Dr. Sicherman had indicated at his deposition. Plaintiffs countered that Candace's potential fault was not an issue in the case, and that the judge had already instructed the jury that it could not consider Candace's own conduct when deciding if Dr. Goldberger was negligent. The judge noted that while the jury could not consider Candace stopping her aspirin regimen to determine if she was comparatively negligent, it could determine if her damages should be mitigated under the doctrine of avoidable consequences.

15

Plaintiffs then contended that defendants' evidence of Candace's potential fault under avoidable consequences could not come from the cross-examination of Dr. Sicherman, when defendants' expert was silent on the issue. In fact, the judge pointed out the defense expert opined in his report that it was appropriate for Candace to stop taking the aspirin after her fall. After conducting a Rule 104 hearing, the judge held defendants would not be allowed to elicit testimony from Dr. Sicherman regarding Candace's decision to stop taking her aspirin because "[a]spirin's out of the case."

The doctrine of avoidable consequences "proceeds on the theory that a plaintiff who has suffered an injury as the proximate result of a tort cannot recover for any portion of the harm that by the exercise of ordinary care he [or she] could have avoided." Ostrowski, 111 N.J. at 437. In its application to medical malpractice claims, "[t]he underlying rationale is that once a patient comes under a physician's care, the law can justly expect the patient to cooperate with the physician in their mutual interests." Cohen v. Cmty. Med. Ctr., 386 N.J. Super. 387, 400 (App. Div. 2006) (citing Ostrowski, 111 N.J. at 445). "As opposed to contributory negligence, the doctrine of avoidable consequences 'normally comes into action when the injured party's carelessness occurs after the defendant's legal wrong has been committed.'" Russo Farms v. Vineland Bd.

of Educ., 144 N.J. 84, 108-09 (1996) (quoting Ostrowski, 111 N.J. at 438). Avoidable consequences are thus "[limited to] consideration of a plaintiff's fault to the time period that begins after a defendant's wrongful conduct." Del Tufo v. Twp. of Old Bridge, 147 N.J. 90, 120 (1996) (citing Ostrowski, 111 N.J. at 438). "Unlike comparative negligence, the doctrine of avoidable consequences is not a defense to liability and serves only to mitigate damages." Komlodi v. Picciano, 217 N.J. 387, 412 (2014). The doctrine "will reduce a recovery because a plaintiff cannot claim as damages the additional injury [a plaintiff] causes to herself [or himself] after a defendant commits a tortious act." Id. at 412-13. For instance, "[a] plaintiff whose broken wrist is wrongly set by a surgeon cannot claim increased damages when, against doctor's orders, [the patient] causes additional harm to [the] wrist while playing tennis." Id. at 413. Guided by these principles, we conclude Judge Dumont did not err in refusing to allow defendants to apply the doctrine of avoidable consequences.

We preface our analysis with the acknowledgement that it is permissible for a party—in this case defendants—to cross-examine or call to testify an opposing expert, or witness, to establish facts to support their trial strategy. Fitzgerald v. Stanley Roberts, Inc., 186 N.J. 286, 301-02 (2006) (citations omitted) ("Even an expert whose knowledge has been purchased cannot be

silenced by the party who is paying him on that ground alone."); see also Lazorick v. Brown, 195 N.J. Super. 444, 454 (App. Div. 1984) ("As a general proposition . . . no party to litigation has anything resembling a proprietary right to any witness's evidence."). Defendants sought to highlight Dr. Sicherman's deposition testimony that the aspirin Candace was taking was to "prevent[] propagation of the clot"; and once she stopped taking her aspirin in mid-November, "the platelets that were being produced were not under the influence . . . of aspirin so these were clottable platelets, and that's when things started to propagate." Once the Doppler study was ordered a few days later, Candace's injuries were revealed. Nevertheless, this strategy was an improper application of avoidable consequences.

Plaintiffs alleged propagation of the blood clots was due to Dr. Goldberger's negligence by not ordering the Doppler study when she complained on two occasions prior to her November 18 appointment and when he failed to return her November 13 and 14 phone calls concerning continuation of the aspirin regimen. Under the avoidable consequences doctrine, Candace's comparative negligence was not an issue. Her decision to discontinue taking aspirin was not admissible because that decision, and the attendant damages, were the result of defendants' negligence. Even though Dr. Sicherman could be

a permissible source from whom defendants could elicit testimony to make their case, the purpose of the sought-after testimony—not to limit plaintiffs' damages but to eliminate or minimize defendants' negligence—rendered it inadmissible. Thus, Judge Dumont did not abuse his discretion in prohibiting defendants from eliciting this testimony, and, in turn, denying their mistrial requests.

## IV

Finally, defendants argue that the cumulative effect of the errors by Judge Dumont require a new trial. In a cumulative error analysis, "we consider the aggregate effect of the trial [judge's] errors on the fairness of the trial." Torres v. Pabon, 225 N.J. 167, 191 (2016). As detailed above, we discern no error based upon our careful review of the record. Thus, there was no cumulative effect that impacted the fairness of the proceedings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION