687 A.2d 1016

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHRISTOPHER GORRELL, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 28, 1996—Decided December 17, 1996.

*Susan Reisner*, Public Defender, attorney for appellant (*Terri A. Cutrera*, Designated Counsel, on the brief).

*Sharon B. Ransavage,* Hunterdon County Prosecutor, attorney for respondent (*Dawn M. Solari,* Assistant Prosecutor, of counsel and on the brief).

Before HAVEY, BROCHIN and EICHEN, JJ.

The opinion of the Court was delivered by

BROCHIN, J.A.D.

Defendant Christopher Gorrell was convicted of second and third degree aggravated assault (*N.J.S.A.* 2C:12–1(b)(1) and -(2)) and third degree possession of a knife for an unlawful purpose (*N.J.S.A.* 2C:39–4(d)). He was sentenced to ten years' imprisonment for the second degree offense and to concurrent five-year terms of imprisonment for each of the other two offenses.

Defendant has appealed. He argues that he was denied a fair trial because of the ineffectiveness of his trial counsel who, he asserts, did not understand the applicable hearsay rules; did not effectively cross-examine the State's witnesses or select the appropriate witnesses to present on his behalf; used an incompetent affidavit to support his motion for a new trial and failed to cite pertinent precedents; and, at sentencing, neglected to present evidence of mitigating factors. He also contends that the trial court committed prejudicial error by admitting hearsay testimony, failing to adequately instruct the jury about the precautions applicable to an admission by silence, and failing to provide curative instructions or to *voir dire* the jury to ascertain possible prejudice after several jurors were inadvertently permitted to see him in handcuffs. Lastly, defendant asserts that the court erred by disregarding mitigating factors which should have reduced his sentence.

Defendant was convicted of assaulting a young man named Bhakti Curtis following a street corner brawl. Curtis was driven to the scene of the assault by a friend who waited for him nearby while the fighting was going on. The friend found Curtis afterwards, lying on his back on the street, bleeding from gaping knife

cuts to his chest and arm. The friend drove Curtis to a hospital emergency room where 250 stitches and 60 staples were used to close his wounds.

Curtis testified for the State. He had been drunk during the fighting and, although he knew and was able to name five of the approximately ten to twelve other combatants, he did not know who had stabbed him. Only one of the State's other witnesses had been present during the brawl. That witness testified that he had been only an onlooker and had never been closer than nineteen feet from the fighting. He told the jury that he did not see defendant strike Curtis.

Defendant told the jury that he had not approached Curtis until Curtis was on the ground and the people who had been around him were dispersing. Then, according to defendant, he only looked at Curtis's wounds and walked away. Three of defendant's friends who had been present during the fighting testified on his behalf. They stated that they had not seen him or anyone else stab Curtis.

The knife with which Curtis had been stabbed was never found. There was testimony that defendant used a box-knife in his work that would have been capable of causing wounds like those inflicted on Curtis, but others of those present were said to own similar knives. There was no testimony that defendant had had his box-knife in his possession on the night of the crime. He denied that he had it with him and there was evidence that it had been broken some time earlier.

The State's case depended entirely on two pieces of evidence. The first of these is the testimony of Donnell Graham. He testified that defendant came to his home shortly after the stabbing. His testimony continued as follows:

Q [W]hat happened after he came to your home?

A He knocked on my door. . . . And I went downstairs, opened the door, and he said, "We got him." And I asked him "Who?" and he said "Bhakti".

. . . . Then I asked him, "What happened?" And he said, "We beat him down."

. . . . [H]e just came out of the blue and said, "I cut him . . . [w]ith my box knife."

The second piece of evidence on which the State rested its case was developed during its cross-examination of one of the defendant's witnesses, Roneld Scott, and during the presentation of its rebuttal case. Scott testified that, while riding in a car with at least two other persons shortly after Curtis was knifed, he met defendant walking with Donnell Graham and perhaps with one or more other friends who had been present during the brawl. The prosecutor then cross-examined him as follows:

Q  [I]sn't it true that everybody was calling the defendant names?

A Yes. . . .

Q  What names do you remember him being called by everybody?

A Well, the person that was really calling names was D [Donnell Graham]. . . .

Q  Do you remember what names he was calling him?

A He called him butcher. . . .

A Donnell, he was the one that was calling him that. And [defendant] told him to "Stop calling me that." He's like "Don't call me that."

Scott was then confronted with a written statement he had given to Police Detective Ronald Cozze and, referring to the statement, the prosecutor asked him whether he had not told Detective Cozze that "Donnell Graham[ ] was calling the defendant Butcher and Zorro, and also Keisha Jones was calling him that." Scott replied, "No. I said Donnell." The prosecutor continued, "And isn't it true that there was no response from the defendant?" Scott answered, "No. . . . [W]hat he said was 'Stop calling me that.' "

The State presented Detective Cozze as a rebuttal witness. After having established that the detective had taken a statement from Scott, the prosecutor asked the following questions and received the following replies:

Q  In that statement did you ask Mr. Scott about the fact that when the defendant returned to the scene of the cutting, that people were calling him, among other things, Zorro and Butcher?

A  Yes.

Q  And did Mr. Scott tell you that the reaction from [defendant] at the time was that he didn't show any—or to use his words, "He didn't show no expression, just was like there." Correct?

A  Yes.

The detective also denied that Scott ever told him that defendant had responded to the epithets by saying, "Don't call me that."

■ Defendant claimed that Graham's testimony was a fabrication. He attempted to buttress that contention by showing that Graham harbored an enmity toward him engendered by earlier controversies.

Graham had married defendant's sister about a year and a half before the trial. On cross-examination, he testified that about a year and a half earlier, he had been living with defendant's sister and defendant in defendant's mother's apartment. He stated that he was asked to leave the apartment because defendant had falsely accused him of "beating the hell out of his little sister." Defendant intended to also offer the testimony of four witnesses who he expected to testify about a recent incident during which Graham had threatened to kill or injure defendant. The prosecutor objected. He argued, and the trial judge agreed, that the witnesses could not testify about Graham's threats because their testimony would be hearsay, that the testimony was not admissible to affect Graham's credibility because he had not been asked about the threats while he was on the witness stand, and that there was no other applicable exception to the hearsay rule. That ruling was error.

If Graham was hostile enough toward defendant to want to kill him, that could reasonably have raised a doubt in the minds of the jurors about whether Graham's testimony was truthful or whether it was fabricated to serve his hostility. A threat to kill, depending on the circumstances under which it was made and how it was expressed, could certainly be evidence that the person who uttered the threat felt extremely hostile toward the person whom he threatened. Common sense therefore strongly suggests that evidence of the threats should be admissible, not because the person who is alleged to have uttered them denies that he did so, but because the threats themselves may be strong evidence of the state of mind of the person who threatened and therefore may

shed material light on the question whether his testimony should be believed.

The trial court's view that some rules of law stood in the way of this commonsense result was mistaken. It is fundamental that

> A witness may be impeached by showing his bias—"bias" being assumed here to be interchangeable with such terms as partiality, hostility, enmity, ill will, malice, and prejudice. Thus, it may be shown that witnesses for the prosecution had met to organize a mob to hang the defendant; that the witness had made threats against the defendant; that quarrels had taken place between the witness and the defendant; or that ill feeling existed between the witness and the defendant.
>
> [2 *Wharton's Criminal Evidence* § 461 (13th ed.1972) (footnotes omitted).]

New Jersey law is to the same effect. *See State v. Smith,* 101 *N.J.Super.* 10, 13, 242 *A.*2d 870 (App.Div.1968) ("[i]t is elementary that a party may show bias, including hostility, of an adverse witness"); *State v. Pontery,* 19 *N.J.* 457, 471–73, 117 *A.*2d 473 (1955). Furthermore, the bias may be proved by extrinsic evidence:

> [F]or the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence relevant to the issue of credibility. . . .
>
> [*N.J.R.E.* 607.]

*See Clayton v. Freehold Twp. Bd. of Educ.,* 67 *N.J.* 249, 253, 337 *A.*2d 361 (1975) (bias of witness may be shown by extrinsic evidence without prior cross-examination of that witness); *State v. Smith, supra,* 101 *N.J.Super.* at 13, 242 *A.*2d 870 (extrinsic evidence may be used to establish bias). The impression of the trial court and the attorneys in the present case, that a prior inconsistent statement is the only category of extrinsic evidence that can be used for impeachment, is incorrect. *See State v. Silva,* 131 *N.J.* 438, 444, 621 *A.*2d 17 (1993) (five modes of attack on witness' credibility recognized, including partiality and prior inconsistent statements); *State v. Johnson,* 216 *N.J.Super.* 588, 603, 524 *A.*2d 826 (App.Div.1987) (testimony regarding use of drugs or alcohol proper as ground for impeaching credibility).

The objection on the ground of hearsay to defendant's proffer of witnesses who would have testified about Graham's

threats against defendant was also mistaken. *Wigmore* states the pertinent rule as follows: "Utterances indirectly indicating *fear, ill-will, excitement,* or *other emotion* on the part of the speaker are also admissible, whether the person be one whose state of mind is in issue ... or a witness whose bias is to be ascertained." 6 *Wigmore on Evidence* § 1790 at 326 (Chadbourn rev.1976); *see* *N.J.R.E.* 803(c)(3); *cf. State v. Benedetto,* 120 *N.J.* 250, 255–56, 576 *A.*2d 828 (1990).

Our holding in *State v. Maxwell,* 50 *N.J.Super.* 298, 142 *A.*2d 108 (App.Div.1958), is squarely in point. We held in that case that the trial court had erred in excluding evidence of threats which was offered to impeach the testimony of the person who uttered the threats. The defendant was tried for atrocious assault. He denied the charge, claiming that he had not been present when the assault was committed. *Id.* at 300–01, 142 *A.*2d 108. To establish that the complaining witness was trying to frame him in order to "get even" with him, the defendant proffered someone who was prepared to testify that he had overheard the complaining witness threaten that he would "get even" with defendant. *Id.* at 306, 142 *A.*2d 108. Our explicit holding was:

> We hold that defendants' counsel had the right to cross-examine the complaining witness with reference to the claimed incident in question *and had a right to pursue this inquiry with a witness who was said to have been present at the time of the alleged conversation. State v. Pontery,* 19 *N.J.* 457, 471, 117 *A.*2d 473 (1955). [Emphasis added.]

> [*Maxwell, supra,* 50 *N.J.Super.* at 307, 142 *A.*2d 108 (emphasis added).]

In the present case, the evidence which incriminated defendant came almost exclusively from Graham. The jury needed to evaluate Graham's credibility in order to decide what weight to give his testimony that defendant had admitted his guilt. The jury also had to evaluate Graham's credibility to decide what significance to attribute to Scott's testimony that Graham was calling defendant "butcher" after the stabbing. The erroneous exclusion of evidence which bears on Graham's credibility requires that defendant be given a new trial.

We will comment on the admissibility of Scott's and Cozze's testimony about the names that defendant was called because that issue will probably arise again on retrial. If Scott had testified consistently with his pretrial statement that when Graham, and perhaps others, called defendant "butcher" shortly after Curtis was stabbed, defendant did not deny, and may have welcomed, the implication, the testimony would have been inadmissible as hearsay unless, as the State contends, it fell within *N.J.R.E* 803(b)(2), the exception for adoptive admissions.[1] That exception applies to "A statement offered against a party which is: ... (2) a statement whose content the party has adopted by word or conduct or in whose truth the party has manifested belief...." Pursuant to that rule, if Scott had testified consistently with his pretrial statement, the admissibility of his trial testimony would therefore have depended on a preliminary judicial finding that defendant had adopted or manifested a belief in the assertion implied by the epithets applied to him. *Cf. Greenberg v. Stanley,* 30 *N.J.* 485, 497–98, 153 *A.2d* 833 (1959); *State v. Briggs,* 279 *N.J.Super.* 555, 653 *A.2d* 1139 (App.Div.), *certif. denied,* 141 *N.J.* 99, 660 *A.2d* 1198 (1995); *Burbridge v. Paschal,* 239 *N.J.Super.* 139, 154–55, 570 *A.2d* 1250 (App.Div.), *certif. denied,* 122 *N.J.* 360, 585 *A.2d* 369 (1990); *see N.J.R.E.* 104(a) and (c) and 803(b) ("In a criminal proceeding, the admissibility of a defendant's statement which is offered against the defendant is subject to Rule 104(c)"). The facts asserted in Scott's statement—that defendant smiled silently when Graham called him "butcher" in the presence of other persons who had been present during the brawl—would have permitted, but would not have compelled, findings by the court and by the jury that defendant's silence was an implied or adoptive admission that he had acted like a butcher in stabbing Curtis.

---

[1] It is possible that the testimony that Graham called defendant "butcher" would also be admissible under the "excited utterance" exception to the hearsay rule if the utterance meets the conditions for that exception. *See N.J.R.E.* 803(c)(2). That possibility was not argued in the trial court or on appeal, but the parties will be free to explore it on remand.

■ However, Scott's trial testimony differed from his pretrial statement. At trial he denied saying that defendant had responded to the epithet by smiling and remaining silent; he testified that defendant told Graham to stop. Scott's pretrial statement itself therefore became admissible as substantive evidence, provided that the pretrial statement satisfied the requirements of *N.J.R.E.* 803(a). *Cf. State v. Brown,* 138 *N.J.* 481, 542, 651 *A.*2d 19 (1994) (inconsistent statement, including a feigned lack of recollection of prior statement, admissible as substantive evidence). The admissibility of the statement therefore depended on a finding by the court that defendant, by his silence, had implicitly admitted the truth of what Graham was implying by calling him "butcher."

■ Detective Cozze's testimony relating what Scott had said in his pretrial statement was not admissible unless the statement was part of the proof of an adoptive admission by defendant. Except as part of an adoptive admission, Scott's pretrial statement was not admissible merely because it contradicted his trial testimony elicited by the State on cross-examination. The State was entitled to cross-examine Scott to prove how defendant had greeted the appellation "butcher" only if defendant's reaction to the epithet was tantamount to an admission of what the epithet implied. Otherwise the testimony about what defendant was called and how he responded was prejudicial hearsay.

In the event of a retrial, whether or not the testimony about what defendant was called and how he responded was objectionable hearsay or an adoptive admission should be determined in a Rule 104 hearing. If the testimony is found to be admissible, the jury, without being told of the court's determination, should be instructed by the court that Scott's testimony about how defendant reacted to Graham's calling him "butcher" should be considered on the issue of defendant's guilt only if the testimony is credited and, in addition, only if the jury finds that defendant's reaction to the epithet is tantamount to an admission that he stabbed Curtis. *See State v. Kobylarz,* 44 *N.J.Super.* 250, 259, 130 *A.*2d 80 (App.Div.), *certif. denied,* 24 *N.J.* 548, 133 *A.*2d 395 (1957),

*overruled sub silentio on other grounds, State v. Deatore,* 70 *N.J.* 100, 115 n. 9, 358 *A.*2d 163 (1976).

Our disposition of the case makes it unnecessary for us to address any of defendant's other argument points except his contention that his sentence was excessive because mitigating factors were not considered. We hold that this last point is entirely without merit. R. 2:11–3(e)(2).

The judgment appealed from is reversed and the case is remanded for further proceedings not inconsistent with this opinion.