14 A.3d 720

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. EDUARDO MCLAUGHLIN, DEFENDANT–
APPELLANT.

Argued September 27, 2010—Decided March 3, 2011.

*Stephen W. Kirsch,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Mary E. McAnally,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Ms. McAnally* and *Robert E. Bonpietro,* Deputy Attorney General, on the briefs).

Justice RIVERA–SOTO delivered the opinion of the Court.

Defendant Eduardo McLaughlin was convicted of various crimes arising out of the robbery and death of his victim. Those convictions were based, in part, on certain hearsay statements admitted by the trial court under the "co-conspirator" exception to the hearsay rule, *N.J.R.E.* 803(b)(5). The Appellate Division disagreed, concluding that the co-conspirator exception was inapplicable under the circumstances. It nevertheless affirmed defen-

dant's convictions because it reasoned that the challenged hearsay statements otherwise were admissible under the "state of mind" exception codified at *N.J.R.E.* 803(c)(3).

We reverse. The "state of mind" hearsay exception should be construed narrowly, focusing specifically on the declarant's state of mind and whether that state of mind is directly relevant to the issues at trial. Because the state of mind of the declarant of the hearsay offered here was not directly relevant to the prosecution of defendant and the hearsay statement itself, without redaction, imputed to defendant the intent to commit a crime, its admission was error.

## I.

Defendant and his victim, Thong Ming Hyunh, then age twenty, had been friends through grade school; although they had lost contact with one another, they later became re-acquainted. By that time, the victim was employed in a check cashing business and, therefore, he often would carry large sums in cash. Defendant, aware that the victim often transported significant amounts of cash, devised a plan to steal that money. Together with Miguel Serrano, one of defendant's friends, and defendant's older brother Pablo McLaughlin,[1] defendant planned to rob his victim and, because the victim obviously knew defendant's identity, murder him. Near mid-day on June 3, 2004, defendant and his victim spoke over the telephone and planned to meet later that day, purportedly to socialize. Following that call and as part of his work, the victim made an approximately $17,000 cash pick-up at a check cashing agency in Philadelphia. While still in possession of that cash and using his sister's van, the victim met defendant; together they drove to a location in Camden where Pablo lived with his girlfriend, Michelle Rivera, and her two children.

---

[1] For ease of reference, Miguel Serrano will be referred to by his surname; solely for the avoidance of confusion arising from the commonality between the two brothers' surnames, Pablo McLaughlin will be referred to by his given name.

When defendant and the victim arrived at Pablo's home, Serrano and Pablo already were there. At some point, defendant and the victim sat at a table to count the victim's money. A loud struggle ensued, and defendant and Serrano wrestled the victim to the floor. While defendant battled with the victim, Serrano held a pillow over the victim's face until he ceased to struggle. Defendant and Serrano bound the victim's head with duct tape and wrapped his body in sheets. They then divided the proceeds, with Serrano receiving $10,000 and defendant the remainder; Pablo asserted that he had received none of the proceeds from the robbery.

That afternoon, Serrano, accompanied by defendant, purchased an all-terrain vehicle for the principal purpose of using it to dispose of the victim's van in an inaccessible spot. Once darkness fell, defendant and Serrano drove the van to a secluded location, where they set fire to it; each bore telltale marks of having set that fire, as they both had slight burns and Serrano's hair was singed. Later that evening, defendant and Serrano dumped the victim's body among the bushes and weeds growing along Penn Street adjacent to Admiral Wilson Boulevard in Camden. Although both events were witnessed—and one witness actually went out to look at the wrapped body the following morning—no one contacted the police.

Responding to the van fire, the police identified the license plate number of the van and traced its ownership to the victim's sister. Once she confirmed that it was her van, the police took her to the location where the van had been set on fire. Knowing her brother had used the van, she grew increasingly concerned and attempted several times to reach him by phone. She was unsuccessful. The following day, she reported to the police that her brother was missing.

The police investigated that report, early on focusing on the telephone calls between defendant and the victim immediately preceding the disappearance. Six days after the robbery and murder, on June 9, 2004, the police interviewed defendant, who

admitted that he and the victim had been school friends who had resumed their friendship just the month before. Defendant claimed that he had not spoken with the victim since June 3, 2004, when they had planned to go out for drinks. He asserted, however, that the victim never called defendant back to confirm their social engagement.

Later that same day, the police received a 9–1–1 telephone call reporting a body on Penn Street; once there, the police were directed to the body's location. The victim was identified by his family by a tattoo on his back below his neck; that identification later was confirmed by the use of dental records.

During the course of what had become a homicide investigation, the police also focused on Serrano. After securing Serrano's consent, the police searched his home and recovered, among other items, a bracelet that the victim's family identified as belonging to him. Jessica Pabón, Serrano's girlfriend and the mother of his then one-year-old child, identified that same bracelet as one she had seen defendant wearing. The police also secured recorded statements from, among others, Michelle Rivera (Pablo's girlfriend), Jessica Pabón (Serrano's girlfriend), Pablo, Ervin González (who defendant and Serrano sought to enlist in this crime but who ultimately chose not to participate), and Jessica Serrano (Serrano's sister, who described the post-robbery spending spree in which defendant and Serrano had engaged), as well as large sums of cash seized from both Serrano's home and his mother's home, together with evidence of purchases made by defendant with the proceeds of the robbery.

The Camden County grand jury returned an indictment charging defendant, Serrano and Pablo with first-degree murder, in violation of *N.J.S.A.* 2C:11–3(a)(1) and (2); first-degree felony murder, in violation of *N.J.S.A.* 2C:11–3(a)(3); first-degree robbery, in violation of *N.J.S.A.* 2C:15–1; second-degree aggravated arson, in violation of *N.J.S.A.* 2C:17–1(a)(2); second-degree burglary, in violation of *N.J.S.A.* 2C:18–2; two counts of third-degree hindering apprehension or prosecution, in violation of *N.J.S.A.*

2C:29–3(a)(3) and (1), respectively; and third-degree conspiracy to commit the foregoing, in violation of *N.J.S.A.* 2C:5–2. Pablo entered into a plea agreement with the State: in exchange for his guilty plea to one count of first-degree robbery and his commitment to testify truthfully in respect of the robbery and murder of Thong Ming Hyunh, the State would recommend the imposition of a term of imprisonment of eighteen years with a mandatory parole disqualifier as required by the No Early Release Act, *N.J.S.A.* 2C:43–7.2.[2]

■ Defendant proceeded to trial alone.[3] During the trial, the State presented the following critical testimony of Serrano's girlfriend, Jessica Pabón:

Q: Did [Serrano] ever speak to you regarding a robbery that he was involved in planning in June of 2004?

A: Yes.

Q: Who was the victim? Who was—who was he planning to rob?

A: They were planning on robbing an oriental young man.

Q: Okay. Why—why were they planning on robbing that specific person?

A: Because supposedly he would have been an easy target.

Q: *Did [Serrano] tell you who—was he planning this robbery with someone else?*

DEFENSE COUNSEL: Objection, your Honor.

PROSECUTOR: It's a statement of a co-conspirator and they are free to call him.

---

[2] At defendant's trial, Pablo sought to recant his several statements that implicated defendant, his younger brother. However, after a *Gross* hearing, *State v. Gross*, 121 *N.J.* 1, 577 *A.2d* 806 (1990), the trial court determined that Pablo's earlier two statements to the police and the statements made during his own plea allocution were reliable. Because a recanting witness is deemed "unavailable," *see State v. Byrd*, 198 *N.J.* 319, 352–53, 967 *A.2d* 285 (2009) (explaining that recanting witnesses are "unavailable" for hearsay rule purposes); *see also N.J.R.E.* 804(a)(4) (defining, in part, "unavailability"), those prior statements were admitted against defendant at his trial. No claim of error has been advanced in respect of those rulings.

[3] Although Serrano jointly was indicted with defendant, the record does not disclose readily the resolution of the charges against Serrano. What is clear is that Serrano did not appear as either a party or a witness during defendant's trial.

DEFENSE COUNSEL: Well, it's a—it can be used for whatever the co-conspirator said, not who else he was going to do it with.

PROSECUTOR: It's also a statement of the defendant.

DEFENSE COUNSEL: Not from the defendant.

THE COURT: Hold off a minute. A statement from—of the defendant through a co-conspirator.

PROSECUTOR: No, one of the co-conspirators—yes. It's a statement of a co-conspirator, which is admissible.

THE COURT: Right. I'll allow it.

Q: *Did [Serrano] tell you who he was planning this robbery with?*

A: *With Eddie.*

Q: *Meaning the defendant?*

A: *Yes.*

Q: All right. Did [Serrano] ever tell you anything about whether they were doing anything, meaning he and the defendant, doing anything to watch the victim?

A: I remember this one day, umm, they were leaving early in the morning and they were going to go watch what he does, what he did throughout his day, something like that.

Q: Okay, meaning the victim.

A: Uh-huh, yes.

[ (Emphasis supplied).]

The trial court admitted that testimony as a co-conspirator declaration, that is, "a statement made at the time [defendant] and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan[,]" *N.J.R.E.* 803(b)(5). That exception to the rule banning hearsay allows the admission of statements among co-conspirators provided the statements are made "at the time" and "in furtherance of" the conspiracy. *See State v. Savage,* 172 *N.J.* 374, 402, 799 *A.*2d 477 (2002) (describing elements required for admission of co-conspirator declaration as "(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be 'evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.'" (quoting *State v. Phelps,* 96 *N.J.* 500, 509–10, 476 *A.*2d 1199 (1984))).

After deliberating over a period of two and one-half days, the jury convicted defendant of aggravated manslaughter (as a lesser

included offense of murder), felony murder, robbery, hindering apprehension, and conspiracy. He was sentenced to an aggregate term of forty-four years' imprisonment, subject to a period of parole ineligibility of thirty-four years, plus appropriate fines and penalties.

Defendant appealed and, in an unpublished, per curiam opinion, the Appellate Division affirmed. Addressing the crucial hearsay testimony elicited from Jessica Pabón concerning the statements made to her by Serrano, the panel focused on whether Serrano's hearsay statements to his girlfriend qualified under the co-conspirator declaration exception to the hearsay rule, particularly in respect of whether the statements were made "in furtherance" of the conspiracy. It explained that there was "no evidence to support the State's contention that [Serrano] made the statements to [Pabón] to enlist her help in [violating the law]." It noted further that "[n]or is there any evidence in the record that [Serrano]'s statements were made to promote in any other way the objectives of the conspiracy." It concluded that, "[r]ather, it appears that [Serrano] told his girlfriend about the planned robbery without soliciting her help in any way." It therefore rejected the reasoning used by the trial court to admit Jessica Pabón's testimony concerning what she was told by Serrano.

The Appellate Division "conclude[d], however, that the statements were admissible under a different hearsay exception, *N.J.R.E.* 803(c)(3), relating to [Serrano]'s plan and intent as his then-existing state of mind." [4] As a threshold inquiry, the panel addressed its authority to consider a basis different than that used by the trial court to sustain the admissibility ruling. It explained that, "[b]ecause an appeal is taken from the court's ruling rather than reasons for the ruling, [an appellate court] may rely on grounds other than those upon which the trial court relied." (citing

---

[4] After oral argument, the Appellate Division requested and received from the parties supplemental submissions on a discrete question not previously argued or considered: whether "[the] testimony of Jessica Pabón [was] admissible in evidence under *N.J.R.E.* 803(c)(3)[.]"

*State v. Maples*, 346 *N.J.Super.* 408, 417, 788 *A.*2d 314 (App.Div. 2002); *State v. DeLuca*, 325 *N.J.Super.* 376, 389, 739 *A.*2d 455 (App.Div.1999), *aff'd as modified*, 168 *N.J.* 626, 775 *A.*2d 1284 (2001)). It reasoned that " '[i]t is a commonplace of appellate review that if the order of the lower tribunal is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance.' " (quoting *Isko v. Planning Bd. of the Twp. of Livingston*, 51 *N.J.* 162, 175, 238 *A.*2d 457 (1968)).

Seeking an alternate ground for the admissibility of Jessica Pabón's testimony concerning what she was told by Serrano, the panel settled on the "state of mind" exception to the hearsay rule, as codified at *N.J.R.E.* 803(c)(3). That exception permits the admission of a "statement made in good faith of the *declarant's* then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." *Ibid.* (emphasis supplied). After surveying the history of that exception, the panel rejected defendant's contention that Pabón's testimony "could only be relevant to prove defendant's state of mind." It focused on Serrano's state of mind, explaining that "the 'good faith' requirement of *N.J.R.E.* 803(c)(3) provides discretion to the courts to exclude out-of-court statements that are unreliable." (citing Biunno, *Current N.J. Rules of Evidence* comment on *N.J.R.E.* 803(c)(3)(2008)). From that point of reference, it reasoned that Serrano's "statements to Jessica [Pabón] addressed a genuine issue in the case, whether he and defendant committed the robbery and homicide." It explained that those statements "were clearly relevant to prove the conduct of [Serrano] and defendant[,]" and that Serrano's "state of mind was also relevant as proof of [his] commission of the crimes for purposes of the State's proofs that defendant was culpable as an accomplice and co-conspirator of [Serrano]." It noted that Serrano's "statements expressed his intent, plan, and design to commit a robbery with defendant[,]" and that "[t]he plan and design included [Serrano]'s going with defendant to scout the victim's movements." After

considering whether the statements at issue contained any disqualifying "statement[s] of memory or belief to prove the fact remembered or believed" and determining that Serrano's comments to his girlfriend were made in good faith, it ultimately "conclude[ed] that the testimony of Jessica [Pabón] about the statements made to her by [Serrano] meets all the conditions for admission in evidence under *N.J.R.E.* 803(c)(3)." The panel determined that "[a]lthough [Serrano]'s statements were not admissible as statements in furtherance of the conspiracy, their admission was not error." [5]

Defendant sought certification, which was granted on a limited basis to explore whether Serrano's hearsay statements, as testified to by Jessica Pabón, were admissible under *N.J.R.E.* 803(c)(3). *State v. McLaughlin*, 201 *N.J.* 155, 988 *A.2d* 1178 (2010).[6]

## II.

Defendant asserts that the Appellate Division erred when it relied on the state of mind exception to the hearsay rule, *N.J.R.E.*

---

[5] The panel also considered and rejected claims that (1) the admission of Jessica Pabón's testimony concerning what she was told by Serrano violated the Confrontation Clause under *Crawford v. Washington*, 541 *U.S.* 36, 59, 124 *S.Ct.* 1354, 1369, 158 *L.Ed.2d* 177, 197 (2004); (2) the admission of Jessica Pabón's hearsay statements to a police investigator constituted plain error; and (3) there was error in the accomplice liability instruction given to the jury.

[6] That limited grant also granted certification on the question of whether alleged errors in the accomplice liability charge were harmless; that charge, to which no objection was asserted, is subject to review under the plain error standard. *See R.* 1:7–2; *R.* 2:10–2; *State v. Torres*, 183 *N.J.* 554, 565, 874 *A.2d* 1084 (2005). In light of the disposition of this appeal, however, we need not reach that question. That said, we take this opportunity to reemphasize yet again "the principles [*State v.*] *Bielkiewicz* [, 267 *N.J.Super.* 520, 527, 632 *A.2d* 277 (App.Div.1993),] sets forth—that when a prosecution is based on the theory that a defendant acted as an accomplice, the court is obligated to provide the jury with accurate and understandable jury instructions regarding accomplice liability even without a request by defense counsel—and we underscore the need to so instruct the jury when liability is sought to be imposed on an accomplice." *State v. Ingram*, 196 *N.J.* 23, 41, 951 *A.2d* 1000 (2008) (citation, internal quotation and editing marks omitted).

803(c)(3), to admit Jessica Pabón's testimony concerning what Serrano told her. He argues that the panel incorrectly relied on *Mutual Life Insurance Co. v. Hillmon*, 145 *U.S.* 285, 294–300, 12 *S.Ct.* 909, 912–14, 36 *L.Ed.* 706, 710–12 (1892), when it held that *N.J.R.E.* 803(c)(3) "not only serves to admit such a statement into evidence to prove Serrano's state of mind, but allows a jury to infer from that statement—with no jury instruction on the matter—that Serrano and defendant engaged in the subsequent criminal behavior referenced in Serrano's hearsay statement." He concludes that "[t]he decision below represents a misapplication of *N.J.R.E.* 803(c)(3)[.]" [7]

Relying on *Hillmon*, the State counters that "a declarant's state of mind of his intent to perform a future act with a nondeclarant has been deemed relevant and reliable to show the declarant's future conduct as well as that of the nondeclarant." According to the State, "[a] person's statements of a present state of mind relating to the cooperative action with another person, made in a natural manner, reflect his mental state and are sufficient to prove his plan." It urges that "the admission of the testimony of the co-conspirator's girlfriend regarding his state of mind ... did not impact the jury's verdict. That verdict was mandated by the overwhelming weight of the evidence, and it should be affirmed."

### III.

#### A.

The hearsay exception that allows testimony concerning a declarant's state of mind is of a proud and long lineage in this State. As early as 1878, New Jersey recognized a "state of mind" exception to the evidence rule barring hearsay. *Hunter v. State*, 40 *N.J.L.* 495, 541 (E. & A. 1878) (recognizing "exception to the

---

[7] Defendant also asserts that the Appellate Division's decision "represents ... a violation of defendant's confrontation rights under the Sixth Amendment and the New Jersey Constitution." In light of the resolution of this appeal, we need not address defendant's Confrontation Clause assertions.

rule excluding hearsay, which legalizes declarations which are explanatory of a state of mind, such mental condition being the subject of inquiry"). That exception is now codified within the *Evidence Rules* and provides as follows:

The following statements are not excluded by the hearsay rule:

....

(c) Statements not dependent on declarant's availability.—Whether or not the declarant is available as a witness:

....

(3) Then existing mental, emotional, or physical condition.—A statement made in good faith of the declarant's then existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

[*N.J.R.E.* 803(c)(3).]

In this appeal, we focus on the beginning portion of that exception: whether a statement of a *declarant's* state of mind is admissible as an exception to the hearsay rule when it imputes to a third party the present intention to commit a future act. We address that task first by tracing the historical context of that hearsay exception.

### B.

In *Hunter, supra,* a murder prosecution, the State sought to introduce a statement made by the defendant on the day of the murder that was overheard by a witness; according to the witness, the defendant and the victim had discussed the victim traveling to Camden and the defendant had offered to make the trip with the victim. 40 *N.J.L.* at 540.[8] The Court determined that, "[i]n this aspect of the evidence, the case seems to be

---

[8] There were two additional statements admitted at trial—one, an oral statement from the victim to his son and, the other, a letter from the victim to his wife—to the effect that, on the night of his murder, he intended to travel from Philadelphia to Camden in the company of the defendant. *Hunter, supra,* 40 *N.J.L.* at 534–36. They were admitted not as exceptions to the hearsay rule but, rather, "as part of the *res gestae.*" *Id.* at 536.

brought fully within that other exception to the rule excluding hearsay, which legalizes declarations which are explanatory of a state of mind, such mental condition being the subject of inquiry." *Id.* at 541.

*Hunter* was cited with approval by the Supreme Court of the United States in *Hillmon, supra,*[9] where the plaintiff, Mrs. Sallie E. Hillmon, brought three consolidated actions for recovery on separate life insurance policies on her husband, John W. Hillmon. 145 *U.S.* at 285, 12 *S.Ct.* at 910, 36 *L.Ed.* at 707. Attempting to prove that John Hillmon was still alive and that the body that had been buried was that of someone other than the insured, that is, one Frederick Adolph Walters, the insurance carriers offered proof of two letters purportedly authored by Walters—one to his sister and the other to his fiancée—to show that Walters, who had not been heard from or seen since, had joined with Hillmon shortly before Hillmon's claimed death. *Id.* at 286, 12 *S.Ct.* at 910–11, 36 *L.Ed.* at 707. Mrs. Hillmon objected to the contents of those letters, asserting that they were inadmissible hearsay, and the trial court sustained her objections. *Ibid.,* 12 *S.Ct.* at 910–11, 36 *L.Ed.* at 708. After the jury returned separate verdicts in favor of Mrs. Hillmon on each of the three insurance policies, the insurance carriers appealed. The Court reversed and remanded the case, ordering that the verdict be set aside and a new trial conducted. *Id.* at 299, 12 *S.Ct.* at 914, 36 *L.Ed.* at 712.

The principal point on appeal raised by the insurance carriers in *Hillmon* was *not* the state of mind hearsay admissibility question. Instead, it was that the trial court erroneously had limited the number of peremptory challenges to which each carrier was entitled; according to the insurance carriers, at separate trials each carrier would have been entitled to three peremptory challenges to the jury venire, but that in the consolidated case, they were granted only an aggregate of three peremptory challenges. *Id.* at 292–94, 12 *S.Ct.* at 911–12, 36 *L.Ed.* at 709–10; *see Leven-*

---

[9] 145 *U.S.* at 299, 12 *S.Ct.* at 914, 36 *L.Ed.* at 711–12.

*stein v. Squires,* 8 *N.J.Super.* 53, 55, 73 *A.*2d 209 (App.Div.1950) (citing *Hillmon* for proposition that "where the plaintiff does bring two actions and they are consolidated for trial, he may have the same number of challenges as if the cases were tried separately"). The Court further determined that "[t]here is, however, one question of evidence so important, so fully argued at the bar, and so likely to arise upon another trial, that it is proper to express an opinion upon it." *Hillmon, supra,* 145 *U.S.* at 294, 12 *S.Ct.* at 912, 36 *L.Ed.* at 710. It defined that question as "the admissibility of the letters written by Walters [shortly before the claimed death of the insured, Hillmon] which were offered in evidence by the defendants, and excluded by the court." *Ibid.*[10]

Ruling that the contents of Walters's letters to his sister and fiancée would be admissible at the retrial, the Court explained that "[a] man's state of mind or feeling can only be manifested to others by countenance, attitude or gesture, or by sounds or words, spoken or written." *Id.* at 295, 12 *S.Ct.* at 912, 36 *L.Ed.* at 710. It noted that "[t]he nature of the fact to be proved is the same, and evidence of its proper tokens is equally competent to prove it, whether expressed by aspect or conduct, by voice or pen." *Ibid.* Invoking traditional notions of relevance, it explained that "[w]hen the intention to be proved is important only as qualifying an act, its connection with that act must be shown, in order to warrant the admission of declarations of the intention." *Ibid.* It concluded that "whenever the intention is of itself a distinct and material fact in a chain of circumstances, it may be proved by contemporaneous oral or written declarations of the party[,]" *ibid.,* relying on earlier precedent to the effect that

---

[10] Because the Court had reached the threshold determination that the case should be reversed and retried based on the failure to grant the defendants sufficient peremptory challenges, the Court's pronouncements in respect of the state of mind hearsay exception may be viewed as dicta, "that is, something that is unnecessary to the decision in the case and therefore not precedential[.]" *Dean v. Barrett Homes, Inc.,* 204 *N.J.* 286, 307 (2010) (Rivera–Soto, J., concurring in part and dissenting in part) (citations and internal quotation marks omitted).

"[w]herever the bodily or mental feelings of an individual are material to be proved, the usual expressions of such feelings are original and competent evidence. Those expressions are the natural reflexes of what it might be impossible to show by other testimony. If there be such other testimony, this may be necessary to set the facts thus developed in their true light, and to give them their proper effect. As independent explanatory or corroborative evidence, it is often indispensable to the due administration of justice. Such declarations are regarded as verbal acts, and are as competent as any other testimony, when relevant to the issue. Their truth or falsity is an inquiry for the jury."

[*Id.* at 296, 12 *S.Ct.* at 913, 36 *L.Ed.* at 710–11 (quoting *Ins. Co. v. Mosley,* 75 *U.S. (8 Wall.)* 397, 404–05, 19 *L.Ed.* 437, 440 (1869)).]

The Court therefore ultimately concluded that "the two letters were competent evidence of the intention of Walters at the time of writing them, which was a material fact bearing upon the question in controversy; and that for the exclusion of these letters . . . the verdicts must be set aside, and a new trial had." *Id.* at 300, 12 *S.Ct.* at 914, 36 *L.Ed.* at 712.

The combined analysis of *Hunter* and *Hillmon* addressing the admission of hearsay statements of a declarant's state of mind has found scant expression in New Jersey's jurisprudence. In *Kelly v. Pitney,* the Court of Errors and Appeals explained that "[w]here . . . the state of mind or intent with which any particular act is done is a relevant fact and the subject of inquiry, declarations made by the person who does the act, and accompanying the act, and which illustrate or explain its character, are a part of the *res [gestae],* and are admissible in evidence." 98 *N.J.L.* 773, 776, 121 *A.* 593 (E. & A.1923) (citations omitted). Thereafter, in *Schloss v. Trounstine,* it was held that "[t]he evidencing of one's plan or design as a condition of mind by one's contemporary statements as to its existence constitutes a well-defined exception to the hearsay rule." 135 *N.J.L.* 11, 13–14, 49 *A.*2d 677 (Sup.Ct.1946). *Schloss* also explained that "[t]he only limitations upon the use of such assertions (assuming the fact of the design to be relevant) are that 'the statements must be of a *present existing state of mind,* and must appear to have been made in a natural manner and not under circumstances of suspicion.'" *Id.* at 14, 49 *A.*2d 677 (quoting *Wigmore on Evidence* (3d Ed.) §§ 102, 1725; emphasis in original). It further stated that

[t]he existence of a design or plan to do a particular act is receivable as evidence of the probable doing of the act, if made under circumstances of naturalness. This is deemed a sufficient basis of rational inference in the daily affairs of life. The declarations are absolutely admissible as statements of a mental condition, to prove the design. They are tokens of the intention. Such are within the hearsay exception whether or no they accompany some conduct relevant in the litigation, or any movement or "act." They are facts of evidentiary value.

[*Ibid.* (quoting *Wigmore, supra,* at §§ 1714, 1725, 1726, 1729).]

Finally, in *State v. Thornton,* this Court noted that

[w]hen a person's engagement in a course of conduct or an act (here, the decedent's visit to defendant's apartment) is relevant to the resolution of a controversy over an occurrence which becomes the subject of subsequent litigation (here, the homicide), declarations of the person of his present intention or plan to do so, are competent, substantive, and original evidence of his probable engagement in the course of conduct or act. That is not a strange or extraordinary doctrine. It represents a rule of evidence which is firmly established by the over-whelming weight of judicial opinion.

[38 *N.J.* 380, 389, 185 *A.*2d 9 (1962), *cert. denied,* 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.*2d 1039 (1963) (citations omitted).] [11]

## C.

The lesson devolved from those authorities is that the application of the *Hunter/Hillmon* framework [12] to this appeal centers on

---

[11] Albeit sporadically, the Appellate Division consistently has interpreted the state of mind exception to the hearsay rule likewise. *See State v. Downey,* 206 *N.J.Super.* 382, 390, 502 *A.*2d 1171 (App.Div.1986) (holding that "[t]he state of mind exception to the hearsay rule has long been recognized and approved notwithstanding the fact that the right to cross-examination is denied" and explaining that "[t]he necessary predicate to admission of such evidence is that: a) the statement reflects a mental or physical condition of the declarant which constitutes a genuine issue in the case or b) the statement is otherwise relevant to prove or explain the declarant's conduct"), *appeal after remand,* 237 *N.J.Super.* 4, 566 *A.*2d 822 (App.Div.1989), *certif. denied,* 121 *N.J.* 627, 583 *A.*2d 323 (1990); *In re Estate of Spiegelglass,* 48 *N.J.Super.* 265, 271, 137 *A.*2d 440 (App.Div.1958) (stating that it is "settled law that by way of exception to the hearsay rule, a person's state of mind may be established by his contemporaneous declarations[,]" and noting that "[t]hey furnish the court with a valuable form of evidence, under some circumstances the best proof that can be had, as to what he was thinking at the time; their value lies simply in this, that they are current expositions of his thoughts").

[12] Defendant has tendered a four-level paradigm for the application of the *Hunter/Hillmon* framework. According to defendant, there are, in ascending

a crucial fact: the hearsay statements at issue in defendant's trial are what Jessica Pabón testified Serrano told her concerning a future criminal act and, more to the point, neither referenced any statement by or on behalf of defendant concerning *defendant's* state of mind. In that latter context, " '[i]t may be regarded as long since settled in this State that *a person's own statements of a present existing state of mind,* when made in a natural manner and under circumstances dispelling suspicion and involving no suggestion of sinister or improper motives, reflect his mental state and are competent to prove the condition of his mind—that is, *his* plan or design.' " *State v. Long,* 173 *N.J.* 138, 154–55, 801 *A.*2d 221 (2002) (quoting *Thornton, supra,* 38 *N.J.* at 390, 185 *A.*2d 9 (emphasis supplied)). Thus, although the admissibility of a defendant/declarant's non-inculpatory state of mind appears beyond doubt, the introduction of a different variable—when the state of mind of the non-party declarant concerning the commission of an offense cannot be attributed either directly or vicariously to the defendant—requires closer scrutiny.

Three distinct approaches to the use of the state of mind exception to the hearsay rule in respect of future conduct of a third-party non-declarant have arisen. One narrowly applies the *Hillmon* doctrine and only allows admission of the statement to prove the declarant's subsequent conduct. *See, e.g., Gual Morales*

---

order, declarant hearsay statements of future intent (Level 1), declarant hearsay statements of future meetings with a defendant to show that in fact the meeting occurred (Level 2), declarant hearsay statements that declarant and the defendant will meet for a benign purpose (Level 3), and declarant hearsay statements that declarant and the defendant will meet for a criminal purpose (Level 4). He principally urges that Level 4 hearsay declarations never qualify under the state of mind exception, a category in which, defendant asserts, the facts of this case conveniently fit. Defendant's proposal turns the relevant analysis on its head, as it makes a determination of the potential prejudicial effect of evidence a crucial threshold factor in respect of admissibility. That view is contrary to the principles our *Evidence Rules* express: it is only *after* a determination of admissibility and relevance is made that the court must then balance whether otherwise admissible "evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice[.]" *N.J.R.E.* 403. We therefore decline to adopt that paradigm.

*v. Hernandez Vega,* 579 *F.*2d 677, 680 n. 2 (1st Cir.1978) (adopting limitation on *Hillmon's* reach suggested by House Committee on the Judiciary, House Report No. 93–650, Note to *Paragraph (3),* 28 *U.S.C.A.* at 579). A second approach expansively applies the *Hillmon* doctrine and would allow admission of the statement to prove the subsequent conduct of both the declarant and non-declarant in all instances. *See United States v. Pheaster,* 544 *F.*2d 353, 374–80 (9th Cir.1976) (noting Federal Advisory Committee's statement that *Hillmon* was to be "left undisturbed" and allowing testimony of declarant's intention to meet defendant and inferences to be drawn therefrom about defendant's later actions). A third approach would allow admission of the above-cited statement as proof of the subsequent conduct of the declarant, and of the non-declarant if independent evidence exists to corroborate the hearsay statement as to the non-declarant. *See, e.g., United States v. Best,* 219 *F.*3d 192, 198 (2d Cir.2000) (allowing hearsay statement when independent evidence connected declarant's statement about future act with non-declarant's subsequent activities), *cert. denied,* 532 *U.S.* 1007, 121 *S.Ct.* 1733, 149 *L.Ed.*2d 658 (2001); *United States v. Delvecchio,* 816 *F.*2d 859, 862–63 (2d Cir.1987) (precluding admission where there was no independent corroborative evidence).

This Court has not addressed the state of mind exception to the hearsay rule codified in *Evidence Rule* 803(c)(3) in the precise context in which Pabón's testimony was used during defendant's trial. In now doing so, we do not embrace any specific alternative of the three listed above. Instead, we take this opportunity squarely to deter overly expansive uses of the *Hillmon* doctrine in respect of our *Evidence Rule* 803(c)(3), particularly where it risks substantial prejudice to a criminal defendant. Our course is so defined because this appeal presents an application of the state of mind hearsay exception that is logically problematic and of questionable reliability; the dangers ascribed to that evidence have been noted elsewhere. *See Shepard v. United States,* 290 *U.S.* 96, 105–06, 54 *S.Ct.* 22, 26, 78 *L.Ed.* 196, 202 (1933). We therefore address directly whether, and how, the state of mind exception to

the hearsay rule should be applied if the declarant's statement will impute to a third party—here a criminal defendant—a present intent to commit a future act.

## D.

■■■ It scarcely need be emphasized that, in determining the admissibility of a hearsay statement made by a non-testifying declarant other than the defendant concerning his state of mind in respect of a future event, trial courts should exercise their discretion with great circumspection. *See Estate of Hanges v. Met. Prop. & Cas. Ins. Co.*, 202 *N.J.* 369, 382, 997 *A.*2d 954 (2010) (reiterating that "in reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion, a proposition this Court uniformly has endorsed" (citations, internal quotation marks and editing marks omitted)). In the exercise of that discretion, the court first must determine whether the hearsay statement satisfies the qualifications for admission codified in *Evidence Rule* 803(c)(3) and then whether that evidence should be excluded as provided in *Evidence Rule* 403. If the court determines that the hearsay statement is admissible and the declarant speaks about a future act that is criminal in nature and that identifies the defendant, then an additional requirement becomes operative: the identity of the non-declarant defendant should be redacted. We address those requirements in order.

■ The initial exercise of discretion in determining the admissibility of a state of mind hearsay statement under *Evidence Rule* 803(c)(3) is governed by a basic tenet of our evidence law: evidence, to be admissible, first must be relevant, that is, it must have "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. Stated differently, in order for a hearsay state of mind statement to be admissible it must satisfy not only the requirements of the hearsay exception, but it also must provide a causal link between the identity of the hearsay declarant and the party or issues on

trial. *See, e.g., Thornton, supra,* 38 *N.J.* at 380, 185 *A.*2d 9 (statements made by decedent to family member regarding her intention to visit defendant at his home admissible to negate defendant's alibi that decedent had confronted him with gun at doctor's office some distance away); *State v. Castagna,* 400 *N.J.Super.* 164, 186–87, 946 *A.*2d 602 (App.Div.2008) (declarant/defendant police officer's own statements to third party in respect of effect of entry of domestic violence temporary restraining order admissible in prosecution regarding attempted murder of domestic violence complainant).

The governing principle is simply stated: to be admissible under the state of mind exception to the hearsay rule, the declarant's state of mind must be "in issue." *State v. Boratto,* 154 *N.J.Super.* 386, 381 *A.*2d 794 (App.Div.1977), *aff'd in part, rev'd in part,* 80 *N.J.* 506, 404 *A.*2d 604 (1979). In sum, then, "[t]he necessary predicate to admission of such evidence is that: a) the statement reflects a mental or physical condition of the declarant which constitutes a genuine issue in the case or b) the statement is otherwise relevant to prove or explain the declarant's conduct." *Downey, supra,* 206 *N.J.Super.* at 390, 502 *A.*2d 1171. For that reason, just as a "victim's state of mind [is] not a relevant issue to be decided by the jury[,]" *State v. Prudden,* 212 *N.J.Super.* 608, 613, 515 *A.*2d 1260 (App.Div.1986), so too an absent co-defendant's state of mind hearsay statement concerning his own state of mind—one that does *not* qualify as a co-conspirator declaration—does not address a relevant issue to be decided by the factfinder.[13]

---

[13] There are, of course, varied instances in which hearsay statements of a non-party concerning his or her state of mind are admissible. However, in each instance, the issue addressed in the hearsay statement still must be one that is central to the issues on trial. *See, e.g., Long, supra,* 173 *N.J.* at 154–55, 801 *A.*2d 221 (victim's hearsay statement of what defendant said admissible); *State v. Gorrell,* 297 *N.J.Super.* 142, 687 *A.*2d 1016 (App.Div.1996) (hearsay statements of witness demonstrating bias against defendant admissible); *Gresham v. Mass. Mut. Life Ins. Co.,* 248 *N.J.Super.* 64, 590 *A.*2d 241 (App.Div.1991) (hearsay evidence of decedent's statements that insurance policy could not be converted from group to individual policy admissible); *Woll v. Dugas,* 104 *N.J.Super.* 586,

■ Furthermore, when, as here, the state of mind hearsay statement directly implicates the defendant, the identity of the non-declarant defendant must be redacted before the hearsay statement is admitted in evidence. This must be so because, as *State v. Roach*, 146 *N.J.* 208, 224, 680 *A.*2d 634, *cert. denied*, 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.*2d 424 (1996), explains, "[i]t is well-settled that the admission of the statement of a co-defendant at a joint trial that implicates defendant without the right of cross-examination constitutes prejudicial error." (citing *Bruton v. United States*, 391 *U.S.* 123, 88 *S.Ct.* 1620, 20 *L.Ed.*2d 476 (1968); *State v. Young*, 46 *N.J.* 152, 215 *A.*2d 352 (1965)). *Roach* underscores that "[d]isclosure to the jury, moreover, of inculpatory information supplied by a co-defendant who did not testify deprives a defendant of his constitutional right to confront a witness." *Ibid.* (citing *State v. Bankston*, 63 *N.J.* 263, 271, 307 *A.*2d 65 (1973) (noting detective's testimony that arrest of defendant following [detective's] receipt of information from informant created "inescapable" hearsay inference); *see also State v. Niesbbalski*, 82 *N.J.L.* 177, 179, 83 *A.* 179 (Supp.Ct.1912) (noting detective's testimony created by "necessary inference" conclusion that complaint against defendant was based on information from co-defendants)); *State v. Taylor*, 350 *N.J.Super.* 20, 33, 794 *A.*2d 246 (App.Div.2002) (" 'The principle distilled from *Bankston* [, *supra* ] and its progeny is that testimony relating inculpatory information supplied by a co-defendant or other non-testifying witness identifying the defendant as the perpetrator of a crime deprives the accused of his or her constitutional rights.' " (quoting *State v. Farthing*, 331 *N.J.Super.* 58, 75, 751 *A.*2d 123 (App.Div.), *certif. denied*, 165 *N.J.* 530, 760 *A.*2d 784 (2000))).

■ If a hearsay declarant unavailable for cross-examination directly implicates a defendant, the principles that inform *Bruton* and *Roach* also guide the redaction process to be followed in the

---

250 *A.*2d 775 (Ch.Div.1969) (hearsay evidence of testamentary intent admissible in action for specific enforcement of agreement to execute reciprocal wills), *aff'd*, 112 *N.J.Super.* 366, 271 *A.*2d 443 (App.Div.1970).

context of a state of mind hearsay statement that identifies a non-declarant defendant. As this Court has noted, "limiting instructions [to the jury] are, as a matter of constitutional law, insufficient to overcome the prejudice to a remaining defendant in a joint trial in which an unavailable codefendant inculpates the remaining defendant[.]" *State v. Meléndez*, 129 *N.J.* 48, 57, 609 *A.*2d 1 (1992) (citing *Bruton*, *supra*, 391 *U.S.* at 124, 88 *S.Ct.* at 1621, 20 *L.Ed.*2d at 478). Therefore, the question becomes what—in order to insure fairness in the proceedings and stout fealty to the constitutional guarantee that a defendant is entitled to confront and cross-examine those who bear witness against him—must a court do in order to redact or "sanitize" a co-defendant's hearsay statement that implicates the non-testifying defendant?

The answer was provided partially in *Richardson v. Marsh*, 481 *U.S.* 200, 107 *S.Ct.* 1702, 95 *L.Ed.*2d 176 (1987), which differentiated between "a co-defendant's [hearsay statement] that expressly implicates the remaining defendant and one that incriminates that defendant only when linked with other evidence presented by the prosecution." *Meléndez*, *supra*, 129 *N.J.* at 58, 609 *A.*2d 1 (citing, *Richardson*, *supra*, 481 *U.S.* at 208, 107 *S.Ct.* at 1707, 95 *L.Ed.*2d at 186). *Richardson* explains the reasoning for that dichotomy as follows:

> Specific testimony that "the defendant helped me commit the crime" is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget. [*Richardson*, *supra*, 481 *U.S.* at 208, 107 *S.Ct.* at 1708, 95 *L.Ed.*2d at 186.]

*Richardson* noted that, when the testimony is "incriminating on its face[,]" *id.* at 208, 107 *S.Ct.* at 1708, 95 *L.Ed.*2d at 186, the constitutional mandate that a defendant be permitted to confront and cross-examine his accusers "can be complied with by redaction[.]" *Id.* at 209, 107 *S.Ct.* at 1708, 95 *L.Ed.*2d at 186. As a result, *Richardson* approved the use of a confession of a non-testifying defendant that was "redacted to eliminate not only the

defendant's name, but any reference to his or her existence." *Id.* at 211, 107 *S.Ct.* at 1709, 95 *L.Ed.*2d at 188.

The care needed in defining the extent of a redaction was defined further in *Gray v. Maryland,* 523 *U.S.* 185, 118 *S.Ct.* 1151, 140 *L.Ed.*2d 294 (1998), which considered "a question that *Richardson* left open, namely whether redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton's* protective rule." *Id.* at 192, 118 *S.Ct.* at 1155, 140 *L.Ed.*2d at 300. It noted that, "unlike *Richardson's* redacted confession, this confession refer[ed] directly to the 'existence of the nonconfessing defendant.' " *Ibid.* In those circumstances, the Court ruled that the use of that confession violated *Bruton's* proscription. *Ibid.* It did so because "[r]edactions that simply replace a name with an obvious blank space or a word such as 'deleted' or a symbol or other similarly obvious indications of alteration, however, leave statements that, considered as a class, so closely resemble *Bruton's* unredacted statements that, in our view, the law must require the same result." *Ibid.,* 118 *S.Ct.* at 1155, 140 *L.Ed.*2d at 301. Therefore, although "*Richardson* placed outside the scope of *Bruton's* rule those statements that incriminate inferentially[,]" and "the jury must use inference to connect the statement in this redacted confession with the defendant[,]" *Gray* ruled that "inference pure and simple cannot make the critical difference[.]" *Id.* at 195, 118 *S.Ct.* at 1156, 140 *L.Ed.*2d at 302.

*Gray* reasoned that the propriety of a redaction "must depend in significant part upon the *kind* of, not the simple *fact* of, inference." *Id.* at 196, 118 *S.Ct.* at 1157, 140 *L.Ed.*2d at 303 (emphasis in original). It distinguished between the inferences allowed in *Richardson* to those prohibited by *Gray* because "*Richardson's* inferences involved statements that did not refer directly to the defendant himself and which became incriminating only when linked with evidence introduced later at trial." *Ibid.,* 118 *S.Ct.* at 1157, 140 *L.Ed.*2d at 303 (citation and internal quotation

marks omitted). It therefore concluded that "the confession here at issue, which substituted blanks and the word 'delete' for the [defendant]'s proper name, falls within the class of statements to which *Bruton's* protections apply." *Id.* at 200, 118 *S.Ct.* at 1158, 140 *L.Ed.*2d at 305.

 Although some have inferred that this Court has adopted the *Bruton/Richardson/Gray*-redaction remedy for co-defendant's statements that directly implicate a defendant, *see, e.g., State v. Guzman,* 313 *N.J.Super.* 363, 383–84, 712 *A.*2d 1233 (App.Div.), *certif. denied,* 156 *N.J.* 424, 719 *A.*2d 1022 (1998), that remedy has not yet been adopted wholesale. That said, we recognize the salutary effect redaction would have in curing the lack of confrontation and cross-examination rights inherent in a hearsay statement. We therefore express what *Meléndez, supra,* 129 *N.J.* at 57–60, 609 *A.*2d 1, implies: a non-testifying declarant's state of mind hearsay statement concerning future acts by the non-declarant/defendant properly must be redacted to omit references to the non-declarant/defendant in order to satisfy both *Evidence Rule* 803(c)(3) as well as the requirements of the Confrontation Clause, *U.S. Const.* amend. VI, and its parallel in the New Jersey Constitution, *N.J. Const.* art. I, ¶ 10.

### E.

 Thus distilled, the principle as applied becomes straightforward. Had Serrano's hearsay statements been offered during Serrano's own trial, the statements would have been admissible as against him. *See N.J.R.E.* 803(b)(1) (excepting party's own statements from hearsay rule). However, in a trial where defendant stands alone, those same statements addressing *Serrano's* state of mind in respect of defendant's possible future acts are not relevant to a central issue in the determination of defendant's guilt. And, at their core, those hearsay statements are unreliable: Serrano's hearsay statements concerning defendant as offered through Jessica Pabón's testimony cannot be cross-examined, and the absence of an effective substitute for cross-examination fails to satisfy the

"good faith" requirement of *Evidence Rule* 803(c)(3) and is fatal to their admissibility. Defendant—who made no statements of a presently existing state of mind—cannot otherwise be liable vicariously for the statements made by Serrano in respect of Serrano's state of mind, particularly where, as here, there was no showing that defendant knew of or otherwise ratified Serrano's hearsay statements. As a result, the admission of those hearsay statements without redaction and over objection—thereby allowing the jury to infer that Serrano's hearsay statements proved that defendant acted as Serrano claimed to his girlfriend—constitutes reversible error that commands a retrial.

In sum, then, the challenged hearsay testimony was plain: Jessica Pabón testified that Serrano told her that he and defendant were going to rob someone whose description matched the victim. Because those hearsay statements do not qualify as having been made in the course and furtherance of a conspiracy, the grounds on which they initially were offered and admitted—as a co-conspirator declaration under *N.J.R.E.* 803(b)(5)—cannot sustain their admission. We further conclude, however, that because the declarant's—Serrano's—state of mind was not relevant to the questions of guilt being tried at defendant's trial, the unredacted hearsay statements also do not qualify under the state of mind exception to the hearsay rule codified at *N.J.R.E.* 803(c)(3) and that defendant's identity should have been redacted from the hearsay statement. We therefore hold that the trial court abused its discretion in admitting those unredacted statements as evidence in the case, *State v. Kemp*, 195 *N.J.* 136, 149, 948 *A.*2d 636 (2008), and that their admission was error "of such a nature as to have been clearly capable of producing an unjust result[.]" *R.* 2:10-2; *State v. Castagna*, 187 *N.J.* 293, 312, 901 *A.*2d 363 (2006). In the circumstances presented,[14] the conclusion that "there was a

---

[14] Here, defendant argued that although the State had some evidence connecting him to the spoils of the robbery and, perhaps, to a subsequent cover-up of the robbery and murder, he maintained that the State had not proved his involvement in the commission of the robbery and attack on the victim. Pabón's

reasonable doubt as to whether th[at] error denied a fair trial and a fair decision on the merits," *State v. Macon,* 57 *N.J.* 325, 338, 273 *A.*2d 1 (1971), cannot be overcome and, hence, a new trial is required. At that new trial, and in the context of a *Rule* 104 proceeding, the trial court first must determine whether Pabón's testimony concerning the hearsay statements made to her by Serrano is admissible under an exception to the hearsay rule. If the trial court, in the exercise of its discretion, determines that such testimony is admissible, the rule we today adopt would require that any hearsay reference to defendant by Serrano be redacted in its entirety.

## IV.

The judgment of the Appellate Division is reversed, defendant's conviction and sentence are vacated, and the cause is remanded to the Law Division for further proceedings consistent with the principles to which we have adverted.

Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, and HOENS join in Justice RIVERA–SOTO's opinion.

*For reversal/vacation/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO and HOENS—6.

*Opposed*—None.

---

evidence tying defendant to pre-robbery planning activities and suggesting his acquiescence to Serrano's future planned conduct provided an important link in the State's case. It bears recalling that defendant's brother, Pablo, recanted his incriminating statements, and another witness, Ervin González, was subjected to impeaching cross-examination on the benefits he stood to gain by assisting the State's case. Despite the admitted wealth of evidence arrayed against defendant, the error in admitting Pabón's testimony was not harmless in light of the several roles the jury could have attributed, on this record, to defendant.